17-3399-cv
*Am. Civil Liberties Union v. Nat'l Sec. Agency*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2018

No. 17-3399-cv

AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
*Plaintiffs-Appellants,*

v.

NATIONAL SECURITY AGENCY, CENTRAL INTELLIGENCE AGENCY,
UNITED STATES DEPARTMENT OF DEFENSE, UNITED STATES
DEPARTMENT OF JUSTICE, UNITED STATES DEPARTMENT OF STATE,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: DECEMBER 4, 2018
DECIDED: MAY 30, 2019

Before: CABRANES, LIVINGSTON, *Circuit Judges*, and SCHOFIELD, *District Judge.*[*]

———

Plaintiffs-Appellants, the American Civil Liberties Union and the American Civil Liberties Union Foundation (jointly, "the ACLU"), requested documents concerning the legal authority for certain national security programs from Defendants-Appellees, several federal agencies (jointly, "the Government"). After exhausting administrative remedies, the ACLU filed suit under the Freedom of Information Act ("FOIA"), requesting that the District Court compel disclosure. To defend the decision to withhold several documents, the Government invoked specific statutory exemptions, including FOIA Exemption 5, which protects from disclosure attorney-client and deliberative communications. The District Court (Kimba M. Wood, *Judge*) granted summary judgment in the Government's favor, holding that the agencies properly withheld the documents under FOIA. On appeal, the ACLU argues that Exemption 5 does not apply because the Government adopted or incorporated the disputed documents when it "relied on" the legal advice contained therein. We conclude that under Exemption 5, an agency (1) "adopts" a previously privileged document where the agency's statements or behavior indicate that the agency treats the document as binding authority, and (2) "incorporates" a previously privileged document "by reference"

———

[*] Judge Lorna G. Schofield, of the United States District Court for the Southern District of New York, sitting by designation.

2

where a formal agency opinion or decision explicitly relies on that document and its reasoning. We find no such adoption or incorporation to have occurred in this case. Accordingly, we affirm the judgment of the District Court.

————

ASHLEY GORSKI (Patrick Toomey, American Civil Liberties Union Foundation, New York, NY; Hannah Bloch-Wehba, David Schulz, Sebastian Brady, Diana Lee, Paulina Perlin, Media Freedom and Information Access Clinic, Abrams Institute, Yale Law School, New Haven, CT, *on the brief)*, American Civil Liberties Union Foundation, New York, NY, *for Plaintiffs-Appellants*.

JEAN-DAVID BARNEA (David S. Jones and Benjamin H. Torrance, Assistant United States Attorneys, *on the brief*), Assistant United States Attorney, *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY, *for Defendants-Appellees.*

————

JOSÉ A. CABRANES, *Circuit Judge*:

The American people have the right to know the laws and policies that bind our government and its agencies. At the same time, government officials must be able to receive confidential legal advice and deliberate frankly. Sometimes, these principles appear contradictory. We can, however, accommodate both by carefully defining the boundary between law, on the one hand, and advice, on the other. Put simply, law *binds.* Accordingly, when inquiring whether a document constitutes an agency's "effective law and policy" or whether it merely contains legal or policy *advice,* courts should inquire whether officials regarded the document as binding. This inquiry allows courts to distinguish between advice, which may be kept secret, and a government's effective law and policy, to which a strong presumption of public access attaches.

Plaintiffs-Appellants, the American Civil Liberties Union and the American Civil Liberties Union Foundation (jointly, "the ACLU"), requested documents concerning the legal authority for certain national security programs from Defendants-Appellees, several federal agencies (jointly, "the Government"). After exhausting administrative remedies, the ACLU filed suit under the Freedom of Information Act ("FOIA"), requesting that the District Court compel disclosure. To defend the withholdings, the Government invoked specific statutory exemptions, including FOIA Exemption 5, which protects from disclosure attorney-client and deliberative communications. The District Court (Kimba M. Wood, *Judge*) granted summary judgment in the Government's favor, holding that the

4

agencies properly withheld the documents under FOIA. On appeal, the ACLU argues that Exemption 5 does not apply because the Government adopted or incorporated the disputed documents when it "relied on" the legal advice contained therein. We conclude that under Exemption 5, an agency (1) "adopts" a previously privileged document where the agency's statements or behavior indicate that the agency treats the document as binding authority, and (2) "incorporates" a previously privileged document "by reference" where a formal agency opinion or decision explicitly relies on that document and its reasoning. We find no such adoption or incorporation to have occurred in this case. Accordingly, we affirm the judgment of the District Court.

## I.   BACKGROUND

### A. Executive Order 12,333 and the ACLU's FOIA Request

On December 4, 1981, President Reagan issued Executive Order 12,333 ("EO 12,333"), entitled "United States Intelligence Activities."[1] The order sought to regulate the "effective conduct of United States intelligence activities" and "protect[ ] . . . constitutional rights."[2] Amended numerous times over the last four decades, EO 12,333 has long served as a "principal Executive Branch authority for foreign intelligence activities."[3] Today, it remains "one of the primary

---

[1] Exec. Order No. 12,333, 46 Fed. Reg. 59,941 (Dec. 4, 1981).

[2] *Id.*

[3] President's Review Grp. on Intelligence and Commc'ns Techs., *Liberty and Security in a Changing World: Report and Recommendations of the President's*

authorities that allow agencies of the intelligence community . . . to gather foreign intelligence."[4]

In the wake of the terrorist attacks of September 11, 2001 and the subsequent expansion of intelligence operations, EO 12,333 became the subject of renewed public attention. On May 13, 2013, the ACLU submitted requests to several federal agencies "seeking the release of records that describe the government's understanding of its surveillance authority under [EO] 12,333" and "the rules that regulate the government's acquisition, retention, use, and dissemination of the communications of Americans swept up in that surveillance."[5] In requesting the documents, the ACLU invoked FOIA, a federal statute enacted in 1966 that facilitates the public release of most government records.[6]

The agencies resisted disclosing the requested records. On December 30, 2013, after exhausting administrative remedies, the

---

*Review Grp. on Intelligence and Commc'ns Techs* 69 (Dec. 12, 2013), https://obamawhitehouse.archives.gov/sites/default/files/docs/2013-12-12_rg_final_report.pdf.

[4] *Am. Civil Liberties Union v. Nat'l Sec. Agency*, No. 13 Civ. 09198 (KMW)(JCF), 2017 WL 1155910, at *1 (S.D.N.Y. Mar. 27, 2017) ("*ACLU I*").

[5] Joint Appendix ("J.A.") 24. The ACLU submitted the requests to the Central Intelligence Agency, the Defense Intelligence Agency, the Federal Bureau of Investigation, the National Security Agency, the United States Department of State, the National Security Division, and the Office of Legal Counsel. *See ACLU I*, 2017 WL 1155910, at *2.

[6] *See* 5 U.S.C. § 552; *see also N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975).

ACLU filed suit under FOIA's cause-of-action provision, seeking to compel the release of the documents.[7]

During the litigation, the Government voluntarily produced hundreds of pages of responsive material. Nevertheless, the Government continued to withhold certain documents, claiming they were exempt from disclosure under specific statutory exemptions.

In early 2016, the parties cross-moved for summary judgment regarding the lawfulness of the Government's decision to withhold the documents. On March 27, 2017, the District Court denied the ACLU's motion in full, and granted the Government's motion in part, approving the Government's decision to withhold most documents, but requiring more detailed justifications for several remaining documents. The District Court then reviewed supplementary briefing from both sides on renewed cross-motions for summary judgment with respect to the remaining documents. On August 17, 2017, the District Court granted the Government's renewed motion for

---

[7] Under FOIA, requesting parties may petition a district court "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must review an agency's decision to withhold records *de novo* to ensure that the decision complies with FOIA's substantive requirements. *Id.* The agency, meanwhile, bears the burden of "sustain[ing] its action"—*i.e.*, the decision to withhold. *Id.*

summary judgment and denied the ACLU's cross-motion.[8] Judgment was entered on August 22, 2017.

### B. The Contested Documents

On appeal, the ACLU contests the District Court's rulings with respect to seven documents.[9]

*OLC 10.* The first document, "OLC 10," is a 108-page memorandum, dated May 6, 2004, from the Assistant Attorney General for the Office of Legal Counsel ("OLC"), Jack L. Goldsmith, III, to Attorney General Alberto Gonzales. The general functions of the OLC include "assisting the Attorney General in the performance of his functions as legal adviser to the President" in part by "advising as to the [ ] form and legality" of Executive orders and actions.[10] The OLC memorandum, titled "Re: Review of the Legality of the STELLAR WIND Program," examines a "highly classified and strictly

---

[8] *See Am. Civil Liberties Union v. Nat'l Sec. Agency*, No. 13 Civ. 9198 (KMW) (JCF), 2017 WL 6387731, at *1 (S.D.N.Y. Aug. 17, 2017) ("*ACLU II*").

[9] Initially, the ACLU also challenged the decision to withhold an eighth document, "OLC 8." While this appeal was pending, however, the Government reprocessed and released most of that document. Accordingly, the ACLU is "no longer seeking disclosure of that memorandum." Reply Br. Appellants 3 n.1.

[10] 28 C.F.R. § 0.25; *see also Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 846 F.3d 1235, 1238 (D.C. Cir. 2017) (discussing the role of OLC generally); *Morrison v. Olson*, 487 U.S. 654, 700 (1988) (Scalia, J., dissenting) (explaining that the role of Assistant Attorney General for OLC is "a post that has traditionally had responsibility for providing legal advice to the President (subject to approval of the Attorney General)"). Justice Scalia, like Chief Justice Rehnquist before him, served in this role.

compartmented program of electronic surveillance" authorized by President George W. Bush in response to the attacks of September 11, 2001.[11] The memorandum reviews the program's history and analyzes its legality under EO 12,333, applicable statutes, and the United States Constitution.[12]

The District Court concluded that OLC 10 is exempt from disclosure under FOIA Exemption 5 because the document is both an attorney-client communication and a deliberative, pre-decisional government memorandum.

*Intelligence Program Documents.* The remaining six documents[13] each contains legal advice from Department of Justice attorneys concerning "[National Security Agency ("NSA")] programs or other intelligence activities."[14]

According to a sworn declaration from a senior NSA official, five of these six documents (NSD 12, 13, 14, and 33, and NSA 11) concern "particular intelligence sources, and related methods used to

---

[11] J.A. 276-77.

[12] *See id.* at 276-351.

[13] The documents are identified individually as NSA 11 and NSD 12, 13, 14, 33, and 49. Collectively, we refer to them as "the intelligence program documents."

[14] *ACLU I,* 2017 WL 1155910, at *14 (NSA 11); *id.* at *12 (NSD 12, 13, 14, 33, and 49).

collect and process foreign communications."[15] The disclosure of these documents "would [therefore] demonstrate the capabilities and limitations" of the United States' signals intelligence systems.[16] Similarly, disclosure of the sixth document (NSD 49) would "tend[ ] to identify the targets of intelligence-gathering efforts, reveal the specific collection techniques and methods employed, and contain details concerning the locations and timing of that collection."[17]

The District Court held that FOIA exempts these six intelligence program documents from disclosure because they contain classified and sensitive national security information.[18]

## C.  The Government's Public Statements

It is undisputed that the contested documents have never been released in unredacted form. The Government has, however, discussed similar subject matter in several public statements. A central issue on appeal is whether these public statements—delivered over a period of 13 years—undermine the Government's claims of attorney-client and deliberative process privilege with respect to OLC 10.

---

[15] J.A. 154 ¶ 38 (Declaration of David J. Sherman, Associate Director for Policy and Records).

[16] *Id.* at 154 ¶ 39.

[17] *Am. Civil Liberties Union v. Nat'l Sec. Agency*, No. 13 Civ. 9198 (KMW) (JCF), Dkt. No. 60 at 15 ¶ 16 (Declaration of Antoinette B. Shiner, Information Review Officer for the Litigation Information Review Office, CIA).

[18] *ACLU II*, 2017 WL 6387731, at *6.

*First*, in a December 19, 2005 White House press briefing, Attorney General Gonzales discussed the "legal underpinnings" of the Stellar Wind program.[19] In that briefing, Gonzales explained that the program was authorized by Congress's 2001 Authorization for the Use of Military Force ("AUMF"), and was in any event a legal exercise of the President's inherent constitutional authority as Commander-in-Chief. Gonzales did not mention OLC opinions in his prepared remarks, and when asked about the possibility of releasing an OLC opinion, responded, "I'm not confirming the existence of opinions or the non-existence of opinions. I've offered up today our legal analysis of the authorities of this President."[20]

*Second*, on January 19, 2006, the Department of Justice transmitted to Congress a "White Paper" entitled "Legal Authorities Supporting the Activities of the National Security Agency Described by the President."[21] According to an accompanying letter, the document was "prepared by the Department of Justice to provide a detailed analysis of the legal basis" for certain NSA activities initiated

---

[19] Office of the Press Sec'y, *Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence*, WHITE HOUSE, (Dec. 19, 2005), https://georgewbush-whitehouse.archives.gov/news/releases/2005/12/20051219-1.html ("2005 Press Briefing").

[20] *Id.*

[21] *Legal Authorities Supporting the Activities of the National Security Agency Described by the President*, DEP'T OF JUST. (Jan. 19, 2006), https://www.justice.gov/sites/default/files/olc/opinions/attachments/2015/05/29/op-olc-v030-p0001.pdf ("White Paper").

in the aftermath of the September 11, 2001 attacks.[22] The White Paper briefly describes NSA surveillance activities and discusses their legality in light of the ongoing threat from Al-Qaeda and pursuant to statutory authorities and the United States Constitution. The paper contains "[m]uch of the legal reasoning" first articulated in OLC 10.[23]

*Third*, on February 6, 2006, Attorney General Gonzales stated, during a hearing before the Senate Judiciary Committee, that he "agreed with the [Office of Legal Counsel's] legal analysis" concerning the Stellar Wind program.[24]

*Fourth*, on July 10, 2009, the Inspectors General of five agencies completed and submitted a classified 747-page comprehensive report concerning the Stellar Wind program ("the Joint IG Report") to several committees of Congress.[25] At the same time, the Inspectors General

---

[22] *Id.* at 1.

[23] Offices of Inspectors General, *Report on the President's Surveillance Program*, Vol. 1 at 49 (July 10, 2009), https://oig.justice.gov/reports/2015/PSP-09-18-15-full.pdf ("Joint IG Report").

[24] *Wartime Executive Power and the National Security Agency's Surveillance Authority: Hearings Before the S. Comm. on the Judiciary*, 109th Cong. 55 (2006), *available at* 2006 WL 270364 ("2006 Hearing").

[25] The report was prepared by the Inspectors General of the Department of Justice, Department of Defense, Office of the Director of National Intelligence, CIA, and NSA. It was delivered to the Senate Select Committee on Intelligence, the Senate Committee on the Judiciary, the House Permanent Select Committee on Intelligence, and the House Committee on the Judiciary. *See* Joint IG Report note 23, *ante*, at iii.

also publicly released a shorter, unclassified version of the report;[26] the Government did not declassify and release a redacted version of the full report until April 2015.[27] The full report discusses the drafting of OLC 10 under the heading "A New Legal Basis for the Program Is Adopted."[28]

*Fifth*, in February 2016, the Government made public a previously classified letter ("OLC 9") from Deputy Assistant Attorney General John C. Yoo to Judge Colleen Kollar-Kotelly, then Presiding Judge of the Foreign Intelligence Surveillance Court. [29] The letter, dated May 17, 2002, "discusses the President's power to deploy expanded electronic surveillance techniques" and "outlines the legal justifications for such surveillance."[30]

*Finally*, while this appeal was pending, the Government reprocessed and released a less-redacted version of an additional

---

[26] *See* Offices of Inspectors General, *Unclassified Report on the President's Surveillance Program* (July 10, 2009), *available at* https://oig.justice.gov/special/s0907.pdf.

[27] *IC on the Record Database: Results*, OFF. OF THE DIRECTOR OF NAT'L INTELLIGENCE, https://www.intelligence.gov/ic-on-the-record-database/advanced-search?keyword=&date=9&sdate=03%2F31%2F2015&edate=05%2F01%2F2015&topic=&catid=#results (indicating April 25, 2015 as the date of publication); *see also* Charlie Savage, *Government Releases Once-Secret Report on Post-9/11 Surveillance*, N. Y. TIMES (April 24, 2015) *available at* https://www.nytimes.com/interactive/2015/04/25/us/25stellarwind-ig-report.html.

[28] *See* Joint IG Report, note 23, *ante*, at 37-39.

[29] J.A. 253-54, 257.

[30] *See id*. at 393.

13

document, "OLC 8." This document, a November 2, 2001 memorandum written by Deputy Assistant Attorney General Yoo, explains, *inter alia*, "legal issues pertaining to surveillance under E.O 12333."[31]

## II. DISCUSSION

We review a district court's grant of summary judgment in FOIA litigation *de novo*.[32]

In conducting our review, we first clarify the scope of FOIA and its exemptions, as well as the concepts of "working law," "adoption" and "incorporation." Applying these principles, we affirm the conclusion of the District Court that OLC 10 is exempt from disclosure under FOIA Exemption 5. We similarly affirm its conclusion that the six intelligence program documents are exempt from disclosure under FOIA Exemptions 1 and 3. Finally, we reject the ACLU's request that we "order the re-processing of the documents," that is, compel the agencies to once again review the contested documents to ensure that only privileged and undisclosed, classified information is redacted.[33]

---

[31] *Id*. at 259.

[32] *See, e.g., New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 112 (2d Cir. 2014) *("N.Y. Times I")*; *see also Halpern v. F.B.I.*, 181 F.3d 279, 287 (2d Cir. 1999) (declining to "depart from a pure *de novo* standard").

[33] Br. Appellants 47.

*A. FOIA and its Exemptions*

Passed in 1966, FOIA was intended to "permit access to official information long shielded unnecessarily from public view."[34] FOIA thus establishes a default rule in favor of Government disclosure, providing that an "agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person."[35] As the Supreme Court has explained, "virtually every document generated by an agency is available to the public in one form or another, unless it falls within one of the [FOIA]'s nine exemptions."[36] In accordance with FOIA's purposes, the statutory exemptions are "narrowly construed."[37]

Our case concerns three of these exemptions: Exemption 1 exempts records that have been properly classified "in the interest of national defense or foreign policy."[38] Exemption 3 exempts records that a statute other than FOIA prohibits from disclosure.[39] Finally,

---

[34] *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 80 (1973).

[35] 5 U.S.C. § 552(a)(3)(A).

[36] *Sears*, 421 U.S. at 136.

[37] *F.B.I. v. Abramson*, 456 U.S. 615, 630 (1982); *see also Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005).

[38] 5 U.S.C. § 552(b)(1)(A).

[39] *Id.* § 552(b)(3).

Exemption 5 exempts records that would be privileged in litigation.[40] The District Court upheld the redaction of OLC 10 under Exemption 5, and the decision to withhold the intelligence program documents under Exemptions 1 and 3. We review each holding in turn.

## B. OLC 10 and FOIA Exemption 5

Exemption 5 exempts from FOIA's disclosure requirements "inter-agency or intra-agency memorandums [sic] or letters that would not be available by law to a party other than an agency in litigation with the agency."[41] This exemption "incorporate[s] into the FOIA all the normal civil discovery privileges,"[42] including "traditional common law privileges against disclosure" such as "the attorney-client and deliberative process privileges."[43] Here, the District Court upheld the redaction of OLC 10 pursuant to both privileges.[44] We agree.

### 1. The Attorney-Client Privilege

As we have explained in prior decisions, "[t]he attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal

---

[40] *Id*. § 552(b)(5).

[41] *Id*.

[42] *Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

[43] *N.Y. Times I,* 756 F.3d at 104.

[44] *ACLU I,* 2017 WL 1155910, at *10.

assistance."[45] The privilege functions to "encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice."[46]

In the context of legal advice to government officials, "the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest."[47] The public interest in ensuring that government officials receive sound legal advice is at its apex when the programs about which advice is sought are secret and unlikely to be subject to litigation. In such cases, the frank exchange between government officials and their attorneys serves as a crucial—and maybe the only—safeguard in ensuring the legality of government action.

The scope of the privilege follows directly from these purposes. The privilege protects "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept

---

[45] *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007).

[46] *Id.* (internal quotation marks omitted); *see also Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (explaining that one purpose of the privilege is "to encourage clients to make full disclosure to their attorneys" (internal quotation marks omitted)).

[47] *In re Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005).

confidential (3) for the purpose of obtaining or providing legal advice."[48]

OLC 10 meets these requirements easily. *First*, as reflected in the index the Government provided to the ACLU, OLC 10 was prepared by an OLC attorney (Assistant Attorney General Goldsmith) for an Executive Branch client (the Attorney General, and eventually, the President).[49] The document is thus a communication between an attorney and a client.

*Second*, the memorandum was written with the understanding that "OLC legal advice is generally kept confidential,"[50] it was "communicated in confidence,"[51] and "none of [its redacted portions] have been previously publicly disclosed."[52] The redacted sections of OLC 10 were thus intended to be, and actually were, kept confidential.

And *third*, by its own description, OLC 10 is one in a series of memoranda which "advised" the Attorney General that certain presidential actions "would satisfy relevant constitutional standards."[53] Moreover, as we have previously explained, OLC

---

[48] *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011); *see also Brennan Ctr. for Justice v. U.S. Dep't of Justice*, 697 F.3d 184, 207 (2d Cir. 2012).

[49] J.A. 259, 276-77; *see also* note 10, *ante* (citing *Morrison*, 487 U.S. at 700).

[50] *Id.* at 244 ¶ 3 (Declaration of Paul P. Colborn, Special Counsel, OLC).

[51] *Id.* at 250 ¶ 19.

[52] *Id.* at 256 ¶ 34.

[53] *Id.* at 284.

memoranda "provide, in their specific contexts, legal advice as to what a department or agency is permitted to do."[54] The communication thus provided legal assistance.[55]

The ACLU does not seriously challenge this analysis. Instead, it argues that while OLC 10 was initially protected by the attorney-client privilege, the Government subsequently waived the privilege through "official acknowledgments" and "public reliance."[56]

The ACLU's assertion of a doctrine of waiver by "official acknowledgment" reflects a basic misunderstanding of the attorney-client privilege. This privilege protects confidential *communications* between an attorney and a client. The "official acknowledgment" doctrine, however, precludes the Government from withholding

---

[54] *New York Times Co. v. U.S. Dep't of Justice*, 806 F.3d 682, 687 (2d Cir. 2015) ("*N.Y. Times II*") (internal quotation marks and emphasis omitted).

[55] That the Attorney General might have transmitted OLC 10 to the White House does not change our analysis. As the OLC declarant explained, "[t]he principal function of OLC is to assist the Attorney General in her role as legal adviser to the President of the United States and to departments and agencies of the Executive Branch." J.A. 244 ¶ 2; *see also* 28 C.F.R. § 0.25 (OLC advises as to the "form and legality" of proposed Executive orders, proclamations and regulations "prior to their transmission to the President."). Accordingly, if OLC 10 was transmitted to the White House, then this transmission is also a communication between an attorney (the Attorney General) and a client (the White House); intended to be and kept confidential; and offered for the purpose of advising the President of the law governing a proposed action. *Id.* at 277, 284.

[56] Br. Appellants 34-35.

*information* on the basis that it is classified after the Government has disclosed substantially the same information.[57]

But such *informational* disclosures have no effect on whether a *communication* is protected by the attorney-client privilege.[58] The attorney-client privilege "protects communications rather than information."[59] We have therefore explained that the attorney-client privilege is not "lost by the mere fact that the information communicated [between attorney and client] is otherwise available to the public."[60] The concept of "official acknowledgment" is thus irrelevant to the Exemption 5 inquiry and cannot provide an independent basis for overcoming Exemption 5.[61]

---

[57] *See N.Y. Times I*, 756 F.3d at 119-20. The principle underlying the "official acknowledgment" doctrine is intuitive: once information is no longer secret, it cannot be protected simply "because it is secret."

[58] *Upjohn*, 449 U.S. at 395 (explaining that the attorney-client privilege "protects disclosure of communications; it does not protect disclosure of the underlying facts").

[59] *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984).

[60] *United States v. Cunningham*, 672 F.2d 1064, 1073 n.8 (2d Cir. 1982); *see also In re Grand Jury Subpoenas Dated Oct. 22, 1991, and Nov. 1, 1991*, 959 F.2d 1158, 1165 (2d Cir. 1992) (discussing generally the difference between information-based and communication-based privileges).

[61] This concept is instead suitable for the Exemptions 1 and 3 inquiries, where the Government seeks to withhold documents on the ground that they contain classified *information. See, e.g., N. Y. Times I*, 756 F.3d at 113, 120 (outlining the "three-part test for 'official disclosure,' relevant to Exemption 1").

By contrast, there is precedent for the ACLU's argument that the Government's "public reliance" on a document erodes its otherwise privileged status. While we have not used the precise phrase "public reliance," we have indeed held that "the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy."[62]

This rule—that an incorporated or adopted document is no longer protected by privilege—mirrors the general "fairness doctrine" that governs the implicit waiver of privilege during litigation.[63] As we have previously explained, "courts have found waiver by implication when a client testifies concerning portions of the attorney-client communication . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense."[64] And so we have consistently rejected parties' attempts to withhold attorney-client communications from a litigation adversary while relying on the same material to advance a claim in court.[65] To put it simply, in court, a party

---

[62] *La Raza*, 411 F.3d at 360.

[63] *See In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987); *see also Brennan Ctr.*, 697 F.3d at 208 ("A party's reliance on an otherwise privileged communication to assert a claim or defense is similar to the type of express adoption or incorporation by reference that vitiates Exemption 5 protection").

[64] *Cnty. of Erie*, 546 F.3d at 228 (quoting *Sedco Int'l S.A. v. Cory*, 683 F.2d 1201, 1206 (8th Cir.1982)) (internal brackets and ellipses omitted).

[65] *John Doe Co. v. United States*, 350 F.3d 299, 303 (2d Cir. 2003); *see also* George A. Davidson & William H. Voth, *Waiver of the Attorney-Client Privilege,* 64 OR. L. REV. 637, 646-53 (1986).

may not wield a privileged communication as both a "shield and a sword."[66]

A similar principle applies when the Government "adopts" or "incorporates" a previously privileged document as its effective law and policy.[67] Just as a litigating party may not offer a privileged communication to *invoke the law* while maintaining the privilege, so too the Government may not expressly *adopt* a privileged communication *as its effective law or policy* while maintaining the privilege. As we explain below, however, in this case the Government has neither expressly "adopted" OLC 10, nor "incorporated [it] by reference."[68]

### 2. *The Deliberative Process Privilege*

In addition to the attorney-client privilege, OLC 10 also meets the requirements of the "deliberative process privilege."

Like the attorney-client privilege, the deliberative process privilege ensures "frank discussion" and protects agencies from being "forced to operate in a fishbowl."[69] But whereas the attorney-client privilege promotes legal compliance in particular, the deliberative

---

[66] *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000).

[67] *See Brennan Ctr.*, 697 F.3d at 195 (holding that Exemption 5 does not apply "when the contents have been adopted, formally or informally, as the agency position on an issue").

[68] *See* Section II.3.b at 37-40, *post*.

[69] *Mink*, 410 U.S. at 87 (internal quotation marks omitted).

process privilege promotes reasoned policy-making in general. As the Supreme Court has explained, "the frank discussion of legal or policy matters in writing might be inhibited if the discussion were made public," and "the decisions and policies formulated would be the poorer as a result."[70] Accordingly, a document may be withheld pursuant to this privilege if it is: "(1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually . . . related to the process by which policies are formulated."[71]

We think it clear that OLC 10 meets these criteria as well. As we have previously recognized, "OLC does not purport, and in fact lacks authority, to make policy decisions. OLC's legal advice and analysis informs the decisionmaking of Executive Branch officials on matters of policy, but OLC's legal advice is not itself dispositive as to any policy adopted."[72] Moreover, the unredacted portions of OLC 10 make clear that OLC's role in the Stellar Wind authorization process was exclusively predecisional and deliberative. The document responds to

---

[70] *Sears*, 421 U.S. at 150-51 (internal quotation marks omitted). Although *Sears* discusses an "executive privilege" rather than a "deliberative process privilege," we have held that "[t]he deliberative process privilege . . . is encompassed within the executive privilege." *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999) (internal quotation marks omitted).

[71] *La Raza*, 411 F.3d at 356 (internal quotation marks omitted).

[72] *Brennan Ctr.*, 697 F.3d at 203 (citing an OLC declaration); *see also N.Y. Times II*, 806 F.3d at 687 ("OLC documents are not working law. At most, they provide, in their specific contexts, legal advice as to what a department or agency is *permitted* to do." (internal quotation marks omitted)).

the Attorney General's request that OLC undertake a "thorough reexamination" of the legality of presidential directives concerning Stellar Wind.[73] As OLC 10 explains, the Attorney General would consult OLC advice (such as OLC 10) in choosing whether to approve the program "as to form and legality."[74] OLC 10 thus preceded and directly related to the Attorney General's approval decision.[75]

### 3. *The Limits of Exemption 5*

As we have previously explained, "[j]ust because a document satisfies [the above] requirements, however, does not mean that the deliberative process [or attorney-client] privilege bars its disclosure."[76] The ACLU therefore relies on three doctrines (which it calls "exceptions") to argue that the Government must release additional portions of OLC 10.[77] The ACLU claims (1) that OLC 10 contains "working law,"[78] (2) that OLC 10 was "adopted," or (3) that OLC 10

[73] J.A. 277.

[74] *Id.* at 284.

[75] Indeed, the Attorney General's approval of the Stellar Wind program "as to form and legality" was itself merely a predecisional and deliberative step before the *actual* policy decision was made by the President—*i.e.*, the decision to reauthorize Stellar Wind. *Id.*

[76] *La Raza*, 411 F.3d at 356.

[77] Properly understood, these doctrines are not "exceptions" to Exemption 5 at all. Rather, they are tell-tale indicators that, notwithstanding its appearance, a document simply is not protected by the deliberative process and attorney-client privileges.

[78] Br. Appellants 18-23.

was "incorporated by reference" as agency policy.[79] Although each of these terms emerges from our caselaw, ACLU's arguments reveal that our prior decisions have not yet adequately defined these concepts and the relationship between them. We therefore accept the parties' invitation to clarify the contours of Exemption 5 and the doctrines that define its limits.

### a. Effective Law and Policy

The Supreme Court first provided clear guidance regarding the limits of FOIA Exemption 5 in 1975 in *N.L.R.B v. Sears, Roebuck & Co.*[80] Drawing a clear distinction between deliberative material and documents that embody law and policy, the Supreme Court explained:

> Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.[81]

The logic of this dichotomy is straightforward. The deliberative process privilege protects "communications received by the decisionmaker on the subject of the decision prior to the time the

---

[79] *Id.* at 23-25.

[80] 421 U.S. 132 (1975).

[81] *Id.* at 153 (internal quotation marks omitted).

decision is made" to ensure that the subsequent decision will be fully informed.[82] By contrast, there is little need to preserve the confidentiality of discussions that take place after a decision has been made and rendered as the agency's "effective law and policy."[83]

Although the conceptual distinction between pre-decisional advice and post-decisional explanation is clear, these materials might look quite similar in practice. For instance, a letter *advising* an agency's leader on how to interpret a statute could look identical to a letter *informing* an agency subordinate about how the agency interprets a statute.

In light of the potential for conflation, the doctrines of "working law," "express adoption," and "incorporation by reference" assist courts in applying this conceptual distinction.[84] As we now explain, "working law" describes a category of post-decisional material, and "express adoption" and "incorporation by reference" describe two methods by which pre-decisional material can become post-decisional.

---

[82] *Id.* at 151-53.

[83] *See id.*

[84] *See Brennan Ctr.*, 697 F.3d at 201 ("The question of whether a document constitutes working law, or has been expressly adopted or incorporated by reference, then, are two paths to determining whether a withheld document constitutes what FOIA affirmatively requires to be disclosed." (internal quotation marks omitted)).

### *i. Working Law*

As might be expected from the phrase itself, a document embodies an agency's "working law" when the document binds agency officials or members of the public. In other words, working law announces what an agency's law *is*, not what the law *might be.* Because such a document has operative effect—*i.e.,* binding rather than persuasive power—it is inherently post-decisional.

In reaching this conclusion, we find instructive certain cases of the Court of Appeals for the District of Columbia Circuit (the "D.C. Circuit"), to which we have referred as "a specialist" in differentiating privileged material from working law.[85] The D.C. Circuit has repeatedly employed a functional test to determine whether a document constitutes "working law," inquiring whether the agency *treats* the document as binding.

For instance, in *Coastal States Gas Corp. v. Department of Energy*, the case from which the working law doctrine emerged, the D.C. Circuit held that when an agency circulated and consulted certain documents as a source of binding authority, these documents were a post-decisional "functioning body of secret law."[86] In that case, the plaintiffs sought disclosure of agency "memoranda from regional counsel to auditors . . . issued in response to requests for interpretations of regulations within the context of particular facts

---

[85] *Id.* at 200.

[86] 617 F.2d 854, 866 (D.C. Cir. 1980) (internal quotation marks omitted).

encountered while conducting an audit of a firm."[87] Evidence revealed that agency auditors did not simply regard the contested memoranda as persuasive or advisory, but that the memoranda "were retained and referred to as precedent."[88] In particular, the D.C. Circuit determined that auditors could not "freely disregard[]" these memoranda, but would request they be "rescinded, amended, or referred to a higher authority."[89] Bound by the directions contained therein, agency auditors then "actually applied" these directions in their "dealings with the public."[90] These features led the D.C. Circuit to conclude that the memoranda were not simply pre-decisional legal advice, but the product of the decision-making process. The agency had, through the circulation of these documents, "promulgated a body of secret law."[91]

Similarly, in *Tax Analysts v. Internal Revenue Service*, the D.C. Circuit found that legal memoranda issued by the IRS's Office of Chief Counsel to officials in the field constituted "working law" even though the memoranda were "nominally non-binding."[92] Despite their nominally advisory status, the memoranda had been distributed to ensure "the promotion of uniformity throughout the country on

[87] *Id.* at 858.

[88] *Id.* at 869.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] 117 F.3d 607, 617 (D.C. Cir. 1997).

significant questions of tax law."[93] Because these memoranda functioned as precedent rather than mere guidance, the D.C. Circuit concluded that they constituted "working law" rather than pre-decisional advice.[94]

As we have previously noted, "[o]ur Court has relatively little case law examining the 'working law' principle."[95] Those few precedents we do have, however, are entirely consistent with the principle that emerges from the D.C. Circuit cases—namely, that working law must be *binding*.[96]

To decide the instant case, we need not reach a comprehensive definition of "working law." But we do identify a few guiding principles to district courts faced with the task of determining whether a document is functionally binding and hence, "working law." Such principles include: whether agency officials feel free to disregard the document's instructions;[97] whether an agency superior distributes the

---

[93] *Id.* (internal quotation marks omitted).

[94] *Id.* at 619.

[95] *Brennan Ctr.*, 697 F.3d at 201.

[96] *See id.* at 198 (equating "working law" with "final opinions" or reports that have "operative effect"); *N.Y. Times II*, 806 F.3d at 687 (explaining that OLC opinions are not "working law" subject to disclosure because "[a]t most, they provide, in their specific contexts, legal advice as to what a department or agency is *permitted* to do" (internal quotation marks omitted)).

[97] *See Coastal States*, 617 F.2d at 869.

document to subordinates (rather than vice versa); [98] whether agency superiors direct their subordinates to follow the document's instructions;[99] whether the document is applied in the agency's dealings with the public;[100] and whether failure to follow a document's instructions provides cause for professional sanction. These factors all provide indications as to whether a document has become binding on agency officials and therefore represents an agency's "effective law and policy."[101]

### ii. Express Adoption

Occasionally, documents drafted as pre-decisional material will ultimately be recycled and reissued as an agency's "working law." The doctrine of "express adoption" describes a process by which courts can discern whether a document first drafted as legal or policy advice has *become* an agency's "effective law and policy."

For instance, an agency's director might receive a memorandum from counsel advising him or her how to conduct a program in accordance with law. The director might then distribute that document to subordinates with instructions to obey the advice rendered therein. After such distribution, the document is no longer privileged. The reason is straightforward: while the initial

---

[98] *See Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978).

[99] *Id.*

[100] *Coastal States*, 617 F.2d at 866.

[101] *Sears*, 421 U.S. at 153.

communication was deliberative and pre-decisional, the subsequent communication was a promulgation of "working law," and therefore post-decisional and no longer privileged.

Because the adoption process is usually internal and hidden from public view, our Court's "express adoption" cases have generally looked for external evidence that such adoption has occurred. In *New York Times Co. v. Department of Justice ("New York Times I")*, for instance, we held that certain Government disclosures fatally undermined the Government's claims that an (initially classified and advisory) OLC memorandum was privileged.[102] We noted that senior government officials engaged in "an extensive public relations campaign to convince the public" of the lawfulness of a government program,[103] and we observed that Attorney General Eric Holder invoked the disputed OLC memorandum as authority for the purposes of that campaign.[104] We also highlighted the Senate testimony of then-Assistant to the President for Homeland Security and Counterterrorism (and incoming Director of the CIA) John O. Brennan that "Office of Legal Counsel advice establishes the legal boundaries

---

[102] *See N.Y. Times I*, 756 F.3d at 116.

[103] *Id.* at 114.

[104] *Id.* at 116; *see also Oversight of the U.S. Department of Justice Before the Senate Committee on the Judiciary*, 113th Cong. (Mar. 6, 2013), *available at* https://fas.org/irp/congress/2013_hr/doj.pdf (explaining that the relevant legal standard would be "more clear if it is read in conjunction with the underlying OLC advice").

within which we can operate."[105] Together, these statements revealed that the OLC memorandum was no longer simply advice to a policy-maker, but that the Government afforded the memorandum binding force within the Executive Branch as its "effective law and policy."[106]

Although less explicit, our decision in *National Council of La Raza v. Department of Justice*, rests on similar reasoning.[107] In that case, we held that the Department of Justice expressly adopted a 2002 OLC

---

[105] *Id.* at 111; *see also id.* at 116. ("[T]he deliberative process privilege [and] the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy. Here, the Government has done so by publicly asserting that OLC advice 'establishes the legal boundaries within which we can operate.'") (internal quotation marks and citations omitted). In context, Mr. Brennan's statement clearly refers specifically to OLC advice concerning the Government's targeted killing program. *See Nomination of John O. Brennan to be Director of the Central Intelligence Agency: Hearing Before the S. Select Comm. on Intelligence,* 113 Cong. 44 (Feb. 7, 2013) ("*Brennan Hearing*"), https://www.intelligence.senate.gov/hearings/open-hearing-nomination-john-o-brennan-be-director-central-intelligence-agency#.

[106] To be clear, the Government's public statements serve as express *evidence* that the Government adopted the OLC memorandum as binding on the CIA. The remarks themselves do not, however, *constitute* adoption. Indeed, Mr. Brennan (who was not yet CIA Director when he made these statements), lacked the authority to adopt the OLC memorandum as binding authority. Adoption occurs when an agency *itself* accepts a previously deliberative document as binding, or actually acts (or refrains from acting) pursuant to the binding instruction (*i.e.,* as "working law") of that document. *See Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 11 (D.C. Cir. 2014).

[107] *La Raza,* 411 F.3d at 350. Admittedly, our opinion in *La Raza* is somewhat imprecise regarding whether "adoption" or "incorporation" provided the precise basis for our decision, or even whether there is a difference between the two. As we define and explain the terms, however, *La Raza* is best understood as a case of express adoption.

memorandum authorizing state governments to make arrests for civil violations of federal immigration provisions.[108] We noted that the Attorney General and his senior staff repeatedly invoked the OLC memorandum not just to defend its own policy, but as *embodying* this new policy.[109] These official statements, we explained, "demonstrate[d] that [DOJ] regarded the Memorandum as the exclusive statement of . . . its new policy."[110] Moreover, DOJ's effective promulgation of this OLC memorandum, as revealed in its public statements, carried substantive legal effects for "what a third party—state and local law enforcement—*should* and *could* lawfully do."[111] The statements therefore amounted to "powerful evidence that [DOJ] explicitly adopted the OLC Memorandum as part of its policy."[112]

Similarly, in *Brennan Center for Justice v. Department of Justice*, we found that public statements revealed that the United States Agency for International Development ("USAID") had adopted an OLC memorandum.[113] In particular, we pointed to a USAID policy

---

[108] *Id.* at 357-58.

[109] *Id.* at 353-55.

[110] *Id.* at 357.

[111] *Id.* at 359 (internal quotation marks omitted).

[112] *Id.* at 359–60.

[113] *Brennan Ctr.*, 697 F.3d at 204-05. As in *La Raza*, our opinion in *Brennan Center* is unclear about whether "adoption" or "incorporation" provided the precise basis for our decision. Again, however, as we understand and explain the terms here, *Brennan Center* is best understood as a case of express adoption.

document explaining that OLC had "determined" that a statutory funding restriction "only may be applied to foreign non-governmental organizations and public international organizations."[114] Later, a senior USAID official confirmed that OLC's determination had effectively *dictated* USAID's new approach.[115] Taken together, these USAID statements provided powerful evidence that senior agency officials related to OLC's legal advice as binding authority, *i.e.* as "working law." We therefore found that USAID adopted the OLC memorandum.

### iii.    Incorporation by Reference

A close cousin to the doctrine of "express adoption" is the doctrine of "incorporation by reference." Much like adoption, an agency incorporates a document by reference when it transforms a previously advisory document into binding "working law."[116] But whereas in "express adoption" cases we look for *indications* that an agency relates to the document as binding, in cases of "incorporation

---

[114] *Id.* at 204.

[115] *Id.* (citing congressional testimony of Randall Tobias, the U.S. Global AIDS Coordinator, who explained that he was "simply following the legislation and the advice to implement that").

[116] When a party claims that a previously privileged document has been "incorporated by refence," a court's task is usually to decide whether a reference to that document itself promulgates the document as binding law. By contrast, in most "express adoption" cases, the court inquires whether an agency's remarks about a previously privileged document provide *evidence* that the document has *already* been promulgated as working law. *See* note 106, *ante*.

by reference," we identify the agency's *enactment* of that document as its law or policy through explicit textual reference in a final decision.[117]

The D.C. Circuit first recognized the doctrine of "incorporation by reference" in a 1969 case, *American Mail Line, Ltd. v. Gulick*.[118] There, the court held that by stating "publicly in [a] ruling that its action was based upon [a specific] memorandum, [and] giving no other reasons or basis for its action," the Maritime Subsidy Board of the Department of Commerce forfeited that memorandum's "intra-agency status" and incorporated it into "a public record" that "must be disclosed."[119]

Six years later, in *Sears*, the Supreme Court endorsed the D.C. Circuit's approach, holding that "if an agency chooses expressly to . . . incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5."[120]

Importantly, *American Mail Line* and *Sears* limit "incorporation by reference" to circumstances where the disputed memorandum is

---

[117] *See, e.g., Gonzales v. Oregon*, 546 U.S. 243, 254 (2006) (describing an agency interpretive rule as "[i]ncorporating the legal analysis of a memorandum . . . solicited from [OLC]"); *see also* Dispensing of Controlled Substances To Assist Suicide, 66 Fed. Reg. 56,607-02 (Nov. 9, 2001) (promulgating an interpretive rule while incorporating a memorandum from the Attorney General).

[118] 411 F.2d 696 (D.C. Cir. 1969).

[119] *Id.* at 703.

[120] 421 U.S. at 161.

relied on in a "final opinion" or "ruling." To decide the instant case, we need not define these terms precisely.[121] But we think it clear that incorporation occurs only when the incorporating "opinion" is itself a document with functionally binding effect. This limitation is significant; a decisionmaker's mere statements expressing his or her reliance on the reasoning of a separate memorandum do not amount to "incorporation" of that memorandum. The limitation is also sensible. Statements such as "we checked it with counsel," or "we relied on the assessments of experts" are standard responses in congressional testimony or public statements. Appropriately, such statements *cannot* "incorporate by reference" external memoranda because such statements do not themselves have binding effect, either within the agency or on the public.

In sum, a previously privileged document is subject to disclosure under the doctrine of "incorporation by reference" only when an agency's formal opinion or determination of law or policy expressly references and relies on that document and its reasoning as the basis for a decision.

### b. Application

The above principles dictate the outcome of this case. The ACLU argues that "reliance on legal analysis as a basis for its operational

---

[121] Among the open issues that we do not decide: whether an incorporating "final opinion" must (1) be public; (2) adjudicate the rights of individual, private parties; or (3) have the "force and effect of law," *see Chrysler Corp. v. Brown*, 441 U.S. 281, 282 (1979).

decisions transforms that analysis into working law."[122] Not so. As we have explained, a document is only "working law" when it operates as functionally *binding* authority on agency decision-makers. Here, OLC 10 was drafted as legal advice rather than binding authority and so was not "working law" when created.[123] To be sure, a document first drafted as legal advice can still be adopted as working law or incorporated into agency decisions. But mere agreement with a document's reasoning and conclusion is insufficient to transform advice into law. Instead, the document must be *treated* as binding by the agency (*i.e.* "adoption") or explicitly relied upon in a formal decision (*i.e.* "incorporation by reference").

Here, there is no evidence that the Government ever "adopted" OLC 10 as binding; nor has the ACLU identified a single agency opinion that incorporates OLC 10 by reference.

The ACLU's arguments to the contrary are unavailing. The ACLU first points to a publicly released 2006 "White Paper" that contains "much of the legal reasoning" in OLC 10.[124] As we have

---

[122] Reply Br. Appellants 3-4.

[123] *See* note 72, *ante; see also Elec. Frontier Found.*, 739 F.3d at 9 (holding that an OLC opinion submitted to the FBI did not constitute "working law" because "OLC is not authorized to make decisions about the FBI's investigative policy, so the OLC Opinion cannot be an authoritative statement of the agency's policy"); *see also Citizens for Responsibility & Ethics in Washington v. United States Dep't of Justice*, 922 F.3d 480, 486 (D.C. Cir. 2019) ("An OLC opinion in the latter category qualifies as the 'working law' of an agency only if the agency has 'adopted' the opinion as its own.").

[124] Br. Appellants 25 (brackets omitted). *See also* note 23, *ante*.

explained, however, disclosure of similar *information* to that contained in documents protected by the attorney-client or deliberative process privileges does not waive the privilege. These privileges protect a communication, not information.[125]

Next, the ACLU contends that a series of public statements by the Government indicates either that OLC 10 is working law, or that the Government expressly adopted OLC 10, or that it incorporated OLC 10 by reference.[126] In particular, the ACLU draws our attention to (1) a press briefing during which Attorney General Gonzalez described OLC 10 as analyzing the "legal underpinnings" of the Stellar Wind program;[127] (2) an internal agency report, which states that OLC 10 provided "a new legal basis" for the program;[128] and (3) Attorney

---

[125] *See* Section II.B.1, *ante*.

[126] The Government urges us not to consider certain public statements by the Government that were available when the parties were before the District Court, but that the ACLU did not explicitly raise in its briefing below. These statements include the 2005 White House press briefing by Attorney General Gonzales, the 2006 Senate testimony (also by Gonzales), and the 2006 DOJ White Paper. We decline to disregard these materials. The Government is, of course, correct that we do not ordinarily hear arguments made for the first time on appeal. *See, e.g., Spinelli v. Nat'l Football League*, 903 F.3d 185, 198 (2d Cir. 2018). The ACLU's reference to these statements does not constitute a new argument, however, but simply new evidence in support of old arguments, which "appeals courts may entertain." *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 221 (2d Cir. 2006) Moreover, the Government's subsequent public statements are precisely the sort of materials of which we may take judicial notice. *See N.Y. Times I*, 756 F.3d at 110 n.8. We therefore consider these statements in evaluating the ACLU's claims.

[127] *See* 2005 Press Briefing, note 19, *ante*.

[128] *See* Joint IG Report, note 23, *ante*, at 37.

General Gonzalez's testimony before the Senate, in which  he stated that he "agreed with [OLC's] legal analysis."[129]

These governmental disclosures illustrate, at most, the following: that OLC analyzed a legal question, that the Attorney General reviewed that analysis and agreed with it, and that the Attorney General then certified the program. None of the governmental disclosures indicate that the Attorney General (or any other official) ever distributed the OLC memorandum as binding precedent, or that officials within NSA or another agency ever regarded OLC 10 as binding authority.[130] Nor do any of these disclosures represent an official decision or final opinion that explicitly references and relies on OLC 10; press briefings, congressional testimony, white papers and inspectors general reports might be informative, but they rarely, if ever, amount to official decisions or "final opinions."

---

[129] *See* 2006 Hearing, note 24, *ante.*

[130] The section of the IG Report to which the ACLU points (entitled "A New Legal Basis for the Program is Adopted") does not constitute evidence that OLC 10 was "expressly adopted" for several reasons: first, while the ACLU suggests that the "new legal basis" mentioned here refers to OLC 10, it seems that this section of the IG Report in fact describes a period *prior* to the writing of OLC 10. Moreover, it is not even clear that the "new legal basis" discussed here refers to a specific document at all. On the contrary, it seems more likely that the phrase "new legal basis" simply refers to a new interpretation of already-extant constitutional and statutory law. In other words, there is no reason to assume that the IG Report used the word "adoption" as we employ it in this opinion; the IG Report may simply describe a shift in Administration lawyers' best understanding of applicable law, not a promulgation of a new "policy."

It follows that OLC 10 was not created as working law, was never adopted as working law, and was never incorporated by reference. We therefore hold that OLC 10 is protected by the deliberative process and attorney-client privileges, and was properly withheld under Exemption 5.

*C. The Intelligence Program Documents*

We also affirm the District Court's holding that the six intelligence program documents are exempt from disclosure under FOIA Exemptions 1 and 3.

Exemption 1 permits agencies to withhold records that have been "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order."[131] As relevant here, Executive Order 13,526 permits classification of information if it pertains to "intelligence sources or methods" or "foreign relations or foreign activities of the United States," where "unauthorized disclosure of the information reasonably could be expected to result in damage to the national security."[132]

FOIA Exemption 3 applies to records "specifically exempted from disclosure by statute."[133] Here, the Government has invoked

---

[131] 5 U.S.C. § 552(b)(1)(A).

[132] Exec. Order No. 13,526, 75 Fed. Reg. 707, 707 § 1.1(a)(3)-(4), 709 § 1.4(c)-(d) (Dec. 29, 2009).

[133] 5 U.S.C. § 552(b)(3).

several statutes, including the National Security Act, which requires that the Director of National Intelligence "protect intelligence sources and methods from unauthorized disclosure."[134] The ACLU does not dispute that each law qualifies as an exemption statute under Exemption 3.[135]

The Government bears the burden of establishing that these exemptions apply, but it can do so by submitting affidavits showing that the statute's application "appears logical or plausible."[136] Such affidavits must describe "with reasonably specific detail" how the withheld information "logically falls within the claimed exemption," and must not be "controverted by either contrary evidence in the record nor by evidence of agency bad faith."[137]

Here, the Government has met its burden. The requested intelligence program documents concern highly sensitive surveillance programs.[138] A senior intelligence official has attested that each

---

[134] 50 U.S.C. § 3024(i)(1). In addition, the Government invokes statutory provisions related to the NSA, CIA, and communications intelligence activities generally. *See* 50 U.S.C. § 3605 (NSA); 50 U.S.C. § 3507 (CIA); 18 U.S.C. § 798 (setting forth criminal penalties for disclosure of classified information).

[135] *ACLU I*, 2017 WL 1155910, at *16; *see also CIA v. Sims*, 471 U.S. 159, 168 (1985) (holding that an earlier version of the relevant National Security Act provision "qualifies as a withholding statute under Exemption 3").

[136] *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009) (internal quotation marks omitted).

[137] *Id.* (internal quotation marks omitted).

[138] *See, e.g.*, J.A. 178-82.

disputed document concerns "particular intelligence sources, and related methods used to collect and process foreign communications"; that the existence of these sources and methods is "currently and properly classified"; and that disclosure of any meaningful part of these documents "would reveal core NSA foreign intelligence activities."[139]

In response to these declarations, the ACLU suggests that the Government failed to segregate and release non-exempt legal analysis.[140] The ACLU points out that "the legal memoranda within the packages are quite lengthy,"[141] and that, in light of the "volume and breadth of public information" about the Stellar Wind program, "it strains credulity to claim that disclosure of pure legal analysis related to the program could damage national security today."[142]

Our credulity is not so easily strained. As we have previously observed, "the very fact that legal analysis was given concerning a planned operation would risk disclosure of the likelihood of that

---

[139] *Id.* at 154 ¶ 38 (Declaration of David J. Sherman, Associate Director for Policy and Records, NSA). The Government's classified declaration contains more detail about these documents' sensitivity. *See id.* at 447.

[140] FOIA "requires agencies and courts to differentiate among the contents of a document rather than to treat it as an indivisible 'record' for FOIA purposes." *Abramson*, 456 U.S. at 626.

[141] Br. Appellants 42.

[142] *Id.* at 39.

operation."[143] Similarly, disclosure of even "[m]inor details of intelligence information may reveal more information than their apparent insignificance suggests because, much like a piece of [a] jigsaw puzzle, each detail may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself."[144] We have long recognized that "in some circumstances legal analysis could be so intertwined with facts entitled to protection that disclosure of the analysis would disclose such facts."[145] Moreover, in this case, a senior national security official has affirmed that the legal analysis contained in these memoranda is "inextricably intertwined" with material that is both classified and protected by statute.[146]

In light of "the relative competencies of the executive and judiciary," we generally adopt a "deferential posture in FOIA cases regarding the uniquely executive purview of national security."[147]

---

[143] *N.Y. Times I*, 756 F.3d at 119.

[144] *Wilner*, 592 F.3d at 73 (internal quotation marks and brackets omitted).

[145] *N.Y. Times I*, 756 F.3d at 119; *see also N.Y. Times II*, 806 F.3d at 687 (holding that certain OLC documents are entitled to protection because "it would be difficult to redact any arguably disclosable lines of legal analysis from these documents without disclosing the contents of [another protected] document").

[146] J.A. 450 ¶ 4 (Supplemental Declaration of David J. Sherman, Associate Director for Policy and Records, NSA).

[147] *Wilner*, 592 F.3d at 76 (internal quotation marks omitted).

Accordingly, we again decline to "second-guess the predictive judgments made by the government's intelligence agencies."[148]

We therefore hold that the surveillance approval packages were properly withheld under Exemptions 1 and 3.

*D. The Request for "Reprocessing"*

Lastly, we briefly address the ACLU's request that we "order the re-processing" of the contested documents in light of several governmental disclosures that post-date the agency's initial FOIA decision.[149]

The ACLU identifies three such disclosures: (1) the full Joint IG Report (released in September 2015), (2) OLC 9 (released in February 2016), and (3) OLC 8 (released while this appeal was pending). Although these disclosures are subsequent to the Government's initial FOIA decision, the ACLU reminds us that it is "legally entitled to file a new FOIA request at any time," and so urges us to consider these documents now in the interests of judicial economy.[150]

The Government responds that these disclosures cannot be the basis for such an order because "[a]s a general rule, a FOIA decision is evaluated as of the time it was made and not at the time of a court's

---

[148] *Id.* (internal quotation marks omitted).

[149] Br. Appellants 47.

[150] Reply Br. Appellants 20.

review."[151] Relying on precisely this rule, the District Court declined to order reprocessing.[152]

Today, we reaffirm the general rule, and further hold that a court reviewing a FOIA decision must not order reprocessing simply to reassure itself that a correct decision remains current. As we have previously observed, "[t]o require an agency to adjust or modify its FOIA response based on post-response occurrences could create an endless cycle of judicially mandated reprocessing each time some circumstance changes."[153] This case highlights the importance of our general practice. Indeed, one of the disclosures the ACLU urges us to consider—OLC 8—was released between the filing of the ACLU's appellate briefs. Imposing a continuing duty on agencies to update their responses to FOIA requests as "potentially relevant" documents (or, as is the case with the Joint IG Report, more *sections* of a certain document) are disclosed piecemeal renders agencies vulnerable to repeated reprocessing requests mid-litigation. FOIA does not subject agencies or the courts to such "an endlessly moving target."[154]

While we have occasionally departed from our general rule and considered subsequent developments as part of a FOIA review, we have done so only in exceptional circumstances. And crucially, we

---

[151] *N.Y. Times I*, 756 F.3d at 110 n.8.

[152] *ACLU I*, 2017 WL 1155910, at *22.

[153] *Florez v. C.I.A.*, 829 F.3d 178, 188 (2d Cir. 2016) (quoting *Bonner v. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991)) (internal quotation marks omitted).

[154] *Bonner*, 928 F.2d at 1153 (internal quotation mark omitted).

have *never* ordered an agency to reprocess records simply to reassure ourselves that a FOIA decision remains up-to-date. In *Florez v. Central Intelligence Agency*, for instance, we remanded to the District Court in light of disclosures that post-dated the Government's decision to withhold particular documents.[155] Critically, however, we noted that the agency had already voluntarily reprocessed the documents.[156] Thus, our decision imposed no additional burden on the agency.

Similarly, in *New York Times I,* although we considered post-decision disclosures in our review, we did so only because reprocessing was unnecessary to decide whether the withheld documents were subject to disclosure.[157] In that case, the CIA had replied to a FOIA request relating to a CIA targeted killing program with a "*Glomar* response"[158]—neither confirming nor denying the existence of a document.[159] The CIA justified its *Glomar* response by stating that "the government has never disclosed . . . whether the CIA has an operational role in the use of targeted lethal force or is

---

[155] *Florez*, 829 F.3d at 187-88.

[156] *Id.* at 188.

[157] *N.Y. Times I,* 756 F.3d at 111 n.8 ("The Government's post-request disclosures go to the heart of the contested issue, and, as discussed below, are inconsistent with some of its prior claims." (internal quotation marks, citations, and brackets omitted)).

[158] The term derives from the *Hughes Glomar Explorer,* a vessel purportedly owned and operated by the CIA, which the Government refused to acknowledge. *See Phillippi v. CIA,* 546 F.2d 1009, 1010-12 (D.C. Cir. 1976).

[159] *N.Y. Times I,* 756 F.3d at 103, 105.

authorized to use such force."[160] This statement was directly contradicted by the post-request disclosures that discussed the CIA program explicitly.[161] There was thus no question that, at the time of the appeal, the Government's "*Glomar* response" was no longer sustainable.[162]

The post-request disclosures at issue in *New York Times I* were therefore not just potentially relevant, but clearly dispositive of the Government's secrecy claims. Under such circumstances, declining to take judicial notice of public statements would serve no purpose. Ignoring such statements would have needlessly added work for the courts and simply delayed the inevitable for the agencies.

In sum, our Court has only departed from the general rule—that an agency's FOIA decision is evaluated as of the time it was made—when doing so is in the clear interest of judicial economy and would not burden the agency with prudential reprocessing. Those are not the circumstances here. The Government has not already reprocessed the material in light of the subsequent disclosures, and the subsequent

---

[160] *Id.* at 122 (brackets omitted).

[161] *Id.* ("With CIA identified, the [Government's] main argument for the use of *Glomar* . . . responses evaporates.").

[162] *See Wilner*, 592 F.3d at 70 ("An agency only loses its ability to provide a *Glomar* response when the existence or nonexistence of the particular records covered by the *Glomar* response has been officially and publicly disclosed.").

47

disclosures do not on their face plainly undermine the Government's claimed privilege.

Accordingly, we decline to order reprocessing in light of the subsequent disclosures of portions of the Joint IG Report, OLC 9, and OLC 8.

## III. CONCLUSION

To summarize, we hold as follows:

(1) A document reflects an agency's "working law" when the agency regards that document as functionally binding authority. "Adoption" and "incorporation by reference" are means by which an otherwise privileged document becomes an agency's "working law."

(2) "Express adoption" is a basis for disclosure of a previously privileged document where an agency's statements indicate that it now acts (or refrains from acting) pursuant to the document's functionally binding authority.

(3) "Incorporation by reference" is a basis for disclosure of a previously privileged document where an agency's formal opinion or ruling explicitly relies on that document and its reasoning in reaching a decision.

(4) OLC 10 was properly withheld under FOIA Exemption 5 (privileged communications).

(5) The six intelligence program documents at issue were properly withheld under FOIA Exemptions 1 (classified information) and 3 (material shielded from disclosure by other statutes).

(6) Because FOIA decisions must be evaluated as of the time of the agency decision, courts should not order reprocessing simply to reassure themselves that a FOIA decision remains current in light of subsequent disclosures. We therefore decline to order reprocessing.

For the foregoing reasons, the August 22, 2017 judgment of the District Court is **AFFIRMED**.