17-2066-cv
The New York Times Company and Charlie Savage v. United States Department of Justice

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

_____

AUGUST TERM 2018

(ARGUED:  DECEMBER 13, 2018          DECIDED:    SEPTEMBER 27, 2019)

No. 17-2066

_____

THE NEW YORK TIMES COMPANY AND CHARLIE SAVAGE

*Plaintiffs-Appellee-Cross-Appellants,*

-v.-

UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant-Appellant-Cross-Appellee.*

1

Before:                    JACOBS and CALABRESI, *Circuit Judges*, and RAKOFF, *District Judge*.[1]

_____

At issue in this case is whether a series of memoranda and accompanying exhibits prepared by a U.S. Attorney acting at the direction of then-Attorney General Eric Holder are protected from disclosure under Exemption 5 of the Freedom of Information Act. The district court (Oetken, *J.*) held that, because the memoranda were "expressly adopted" by Holder, Exemption 5 had been overcome, but a subsequent decision of this Court, American Civil Liberties Union v. National Security Agency, 925 F.3d 576 (2d Cir. 2019), has now clarified that the "express adoption" exception to Exemption 5 does not apply in the instant context. This leaves the issue of waiver. The Court concludes that Mr. Holder's public statements only waived the work product privilege with respect to one of the memoranda's conclusions, so that only the portions of the memoranda and exhibits related to that conclusion must be disclosed. Accordingly, the judgment of the district court is hereby AFFIRMED IN PART and REVERSED IN PART.

_____

| | |
|---|---|
| APPEARING FOR APPELLANT: | JEANNETTE A. VARGAS, Assistant U.S. Attorney |
| | United States Attorney's Office for the Southern District of New York |
| | New York, NY |
| APPEARING FOR APPELLEES: | DAVID EDWARD MCCRAW |
| | The New York Times Company |
| | New York, NY |

---

[1] Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

_____

RAKOFF, *District Judge*:

Plaintiffs-appellees The New York Times and reporter Charlie Savage (collectively "The Times") seek access under the Freedom of Information Act ("FOIA") to five internal memoranda of defendant-appellant the Department of Justice ("DOJ") and accompanying exhibits. These memoranda and exhibits detail DOJ's legal reasoning and factual analysis in making the determinations, first, that it would formally investigate only two of more than one hundred alleged instances of abuse of detainees allegedly held overseas in the custody of the Central Intelligence Agency ("CIA") and, subsequently, that it would not bring criminal charges in either of those two cases.

DOJ argues, and the plaintiffs do not contest, that these memoranda and exhibits were attorney work product when drafted, which would generally shield them from disclosure under FOIA's Exemption 5. Plaintiffs argue, however, that two public statements thereafter made by then-Attorney General Eric Holder had the effect of (a) expressly adopting or incorporating by reference the contents and reasoning of the memoranda and exhibits or (b) waiving the work product protection under common law principles, in either case removing

3

them from Exemption 5 protection. The District Court granted, in relevant part, the Times's motion for summary judgment, holding that Attorney General Holder's public statements expressly adopted the memoranda by relying on their reasoning. Subsequently, however, a panel of this Court, in <u>American Civil Liberties Union v. National Security Agency</u>, 925 F.3d 576 (2d Cir. 2019), clarified the reach of the "expressly adopted" exception to Exemption 5 in ways that make the district court's approach untenable.[2] Nonetheless, common law principles of waiver, which are applicable to Exemption 5, require disclosure of some limited portions of the memoranda and exhibits. We therefore affirm in part and reverse in part.

## BACKGROUND

The Times seeks access under FOIA to five memoranda (and accompanying exhibits) written by U.S. Attorney John Durham to then-Attorney General Eric Holder.[3] These memoranda and exhibits contain Durham's recommendations not to open formal criminal investigations in all but two

---

[2] Because <u>American Civil Liberties Union</u> was decided after the instant appeal had been fully briefed and argued, the parties here were permitted to file supplemental briefs describing the effect of that decision on the instant appeal, as well as arguing the issue of common law waiver not fully considered in the previous briefs.

[3] Mr. Durham is currently the U.S. Attorney for the District of Connecticut, but at the times relevant to this appeal was the Acting U.S. Attorney for the Eastern District of Virginia.

instances of the CIA's alleged mistreatment of detainees overseas in the years following the September 11, 2001 attacks, and not to pursue criminal charges in those two cases.

As the two District Court opinions below explain in more detail, see 138 F. Supp. 3d 462 (S.D.N.Y. 2015) and 235 F. Supp. 3d 522 (S.D.N.Y. 2017), the investigations at issue began in January 2008 when a previous Attorney General, Michael Mukasey, appointed Durham to lead a criminal investigation into the CIA's destruction of video tapes of detainee interrogations abroad. In April 2009, Holder expanded Durham's mandate, directing him to investigate potential violations of law (such as "waterboarding") in connection with the interrogations themselves. 138 F. Supp. 3d at 467. Durham proceeded to investigate 101 alleged incidents of CIA mistreatment of detainees. Id. On May 26, 2011, Durham sent a confidential memorandum to  Holder and Deputy Attorney General James Cole, recommending that the Department open formal criminal investigations into only two of the alleged incidents — in both of which the respective detainee had died in custody — and to close the informal preliminary investigations of the other ninety-nine. Id. Durham also provided two additional reports, with a total

of eleven exhibits, dated December 14, 2010 and May 26, 2011, detailing further support for his recommendations to open the two formal investigations. Id.

On June 30, 2011, Holder issued a press release accepting Durham's recommendations. 138 F. Supp. 3d at 467-68. In pertinent part, the release read as follows:

> On August 24, 2009, based on information the Department received pertaining to alleged CIA mistreatment of detainees, I announced that I had expanded Mr. Durham's mandate to conduct a preliminary review into whether federal laws were violated in connection with the interrogation of specific detainees at overseas locations. I made clear at that time that the Department would not prosecute anyone who acted in good faith and within the scope of the legal guidance given by the Office of Legal Counsel regarding the interrogation of detainees. Accordingly, Mr. Durham's review examined primarily whether any unauthorized interrogation techniques were used by CIA interrogators, and if so, whether such techniques could constitute violations of the torture statute or any other applicable statute.

In carrying out his mandate, Mr. Durham examined any possible CIA involvement with the interrogation of 101 detainees who were in United States custody subsequent to the terrorist attacks of September 11, 2001, a number of whom were determined by Mr. Durham to have never been in CIA custody. He identified the matters to include within his review by examining various sources including the Office of Professional Responsibility's report regarding the Office of Legal Counsel memoranda related to enhanced interrogation techniques, the 2004 CIA Inspector General's report on enhanced interrogations, additional matters investigated by the CIA Office of Inspector General, the February 2007 International Committee of the Red Cross Report on the Treatment of Fourteen "High Value Detainees" in CIA Custody, and public source information.

Mr. Durham and his team reviewed a tremendous volume of information pertaining to the detainees. That review included both information and matters that had never previously been examined by the Department. Mr. Durham has advised me of the results of his investigation, and I have

accepted his recommendation to conduct a full criminal investigation regarding the death in custody of two individuals. Those investigations are ongoing. The Department has determined that an expanded criminal investigation of the remaining matters is not warranted.

Statement of the Attorney General Regarding Investigation into the Interrogation of Certain Detainees, Dep't Just. (June 30, 2011).

Over the next fourteen months, Durham further investigated the two detainee deaths, but ultimately concluded that DOJ should not file charges in those cases. He communicated these recommendations in two additional memoranda addressed to Eric Holder and the Deputy Attorney General, dated March 14, 2012 and July 11, 2012. 138 F. Supp. 3d. at 468. On August 30, 2012, Holder adopted both recommendations in a second press release, which read as follows:

> [Mr.] John Durham has now completed his investigations, and the
> Department has decided not to initiate criminal charges in these matters.
> In reaching this determination, Mr. Durham considered all potentially

8

applicable substantive criminal statutes as well as the statutes of limitations and jurisdictional provisions that govern prosecutions under those statutes. Mr. Durham and his team reviewed a tremendous volume of information pertaining to the detainees. That review included both information and matters that were not examined during the Department's prior reviews. Based on the fully developed factual record concerning the two deaths, the Department has declined prosecution because the admissible evidence would not be sufficient to obtain and sustain a conviction beyond a reasonable doubt.

During the course of his preliminary review and subsequent investigations, Mr. Durham examined any possible CIA involvement with the interrogation and detention of 101 detainees who were alleged to have been in United States custody subsequent to the terrorist attacks of September 11, 2001. He determined that a number of the detainees were never in CIA custody. Mr. Durham identified the matters to include within his review by examining various sources including the Office of Professional Responsibility's report regarding the Office of Legal Counsel

memoranda related to enhanced interrogation techniques, the 2004 CIA

Inspector General's report on enhanced interrogations, additional matters

investigated by the CIA Office of Inspector General, the February 2007

International Committee of the Red Cross Report on the Treatment of

Fourteen 'High Value Detainees' in CIA Custody, and public source

information.

Mr. Durham and his team of agents and prosecutors have worked

tirelessly to conduct extraordinarily thorough and complete preliminary

reviews and investigations. I am grateful to his team and to him for their

commitment to ensuring that the preliminary review and the subsequent

investigations fully examined a broad universe of allegations from

multiple sources. I continue to believe that our Nation will be better for it.

Statement of Attorney General Eric Holder on Closure of Investigation into the

Interrogation of Certain Detainees, Dep't Just. (Aug. 30, 2012).

On April 11, 2014, the New York Times submitted an FOIA request

seeking from the DOJ "any reports to the attorney general describing or

presenting findings" from Mr. Durham's investigations. After DOJ declined to produce these documents, the Times filed suit in the District Court on May 28, 2014. DOJ subsequently provided an index stating that it had withheld eighteen responsive memoranda under various FOIA exemptions. The parties cross-moved for summary judgment.

The District Court granted in part and denied in part each party's motion for summary judgment. As relevant to this appeal, which covers only five of the memoranda and associated exhibits described above, the Court held that Exemption 5 did not apply to the memoranda and exhibits because Holder had "expressly adopted" them through his public statements. 138 F. Supp. 3d at 476-79. However, the Court allowed redactions of the portions of the documents and their exhibits that did not relate to "Durham's reasoning regarding the sufficiency of the evidence or the applicable federal law," as well as redactions pursuant to other FOIA exemptions. Id. at 478-79; 235 F. Supp. 3d at 542. DOJ then brought this appeal, contending that Exemption 5 shields these memoranda and exhibits from disclosure in their entirety.

# DISCUSSION

We review *de novo* the District Court's grant of summary judgment in an FOIA suit. Am. Civil Liberties Union v. Nat'l Sec. Agency, 925 F.3d 576 (2d Cir. 2019); Halpern v. F.B.I., 181 F.3d 279, 287 (2d Cir. 1999). We begin by reviewing the legal framework that governs the case, and then apply this framework to the relevant facts.

## A. Legal Framework

### 1. FOIA

The Freedom of Information Act, 5. U.S.C. § 552, requires federal departments and agencies to "make available to the public" all of their information except for that covered by the specific exceptions enumerated in § 552(b). FOIA is a far-reaching statute. It allows the public to access "virtually every document generated by an agency," unless an exception applies. N.L.R.B. v. Sears, Roebuck & Co., 421 U.S. 132, 136 (1975).

FOIA "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." Halpern v. F.B.I., 181 F.3d 279, 286 (2d Cir. 1999). The statute "seeks to permit access to official information long shielded unnecessarily from public view and attempts to create

12

a judicially enforceable public right to secure such information from possibly unwilling official hands." Envtl. Prot. Agency v. Mink, 410 U.S. 73, 80 (1973).

At the same time, "important interests [are] served by [FOIA's] exemptions." Food Mktg. Inst. v. Argus Leader Media, No. 18-481, 588 U.S. __, slip op. at 11 (2019) (quoting F.B.I. v. Abramson, 456 U.S. 615, 630-31 (1982)). These exemptions "are as much a part of FOIA's purposes and policies as the statute's disclosure requirement," Id. (alterations omitted) (quoting Encino Motorcars, LLC v. Navarro, No. 16-1362, 584 U.S. __, slip op. at 9 (2018)).

### 2. FOIA Exemption 5 and the Attorney Work Product Privilege

One of the specifically-enumerated exemptions from FOIA's general rule in favor of disclosure is Exemption 5, which allows agencies to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). Courts universally read this provision to mean that agency documents that would be privileged in ordinary civil discovery are also protected from disclosure under FOIA. See, e.g., N.L.R.B. v. Sears Roebuck & Co., 421 U.S. 132, 148-49 (1975); Am. Civil Liberties Union v. Nat'l Sec. Agency, 925 F.3d 576, 589 (2d Cir. 2019); New York Times Co. v. U.S. Dep't of Justice, 756 F.3d 100, 104 (2d

13

Cir. 2014); Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 481 (2d Cir. 1999).

Specifically, Exemption 5 incorporates three judicially-developed (i.e., common law) privileges: the attorney-client privilege, the deliberative process privilege, and the attorney work product privilege. Nat'l Council of La Raza v. U.S. Dep't of Justice, 411 F.3d 350, 356 (2d Cir. 2005); see also N.L.R.B. v. Sears, Roebuck & Co., 421 U.S. at 154 ("It is equally clear that Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5 . . . .").

The civil discovery privilege relevant here is the qualified privilege for attorney work product.[4] Famously first enunciated in the case of Hickman v. Taylor, 329 U.S. 495 (1947), and now codified in Fed. R. Civ. P. 26(b)(3), this doctrine prohibits one party in litigation from discovering from its adversary any "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative," absent a showing of substantial need. Not only an attorney's mental impressions and opinions about a case but also the results of the attorney's factual investigations in anticipation

---

[4] Courts sometimes refer to the attorney work product protection as a "doctrine" or "qualified" privilege, rather than an absolute "privilege," United States v. Adlman, 134 F.3d 1194, 1204 (2d Cir. 1998), because, except in the case of "mental impressions, conclusions, opinions, or legal theories," it can be overcome by a showing of "substantial need." Fed. R. Civ. P. 26(b)(3)(A)-(B). Nevertheless, like most courts, we will for convenience simply refer to it as the "work product privilege."

of the case may constitute attorney work product, <u>In re Grand Jury Subpoena Dated July 6, 2005</u>, 510 F.3d 180, 183-84 (2d Cir. 2007), though the former receives stronger protection against disclosure than the latter, <u>id.</u>; Fed. R. Civ. P. 26(b)(3)(B).

As many courts have explained, the purpose of the work product privilege is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." <u>United States v. Adlman</u>, 134 F.3d 1194, 1196 (2d Cir. 1999) (quoting <u>Hickman</u>, 328 U.S. at 510-11). This same confidentiality applies to the work product of government. A lawyer to a government agency, like a lawyer to any private litigant, must "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy." <u>Hickman</u>, 329 U.S. at 511. Forcing agencies to disclose this work product in response to FOIA requests would render it impossible for agency staff to effectively perform their jobs. "[M]uch of what is now put down in writing would remain unwritten," <u>id.</u>, at great cost to the efficiency and effectiveness of government lawyers. The work product of government attorneys

15

is therefore entitled to the same protection as that of private lawyers. <u>Sears</u>, 421 U.S. at 154.

### 3. The "Working Law" Doctrine

Our analysis thus far suggests a straightforward inquiry in this case: Were U.S. Attorney Durham's memoranda attorney work product at the time he wrote them? If so, did Holder's public statements about them waive the privilege?

The District Court's opinions below, however, took a different approach to resolving the Exemption 5 question in this case, asking whether the DOJ "expressly . . . adopt[ed] . . . or incorporate[d] . . . by reference" these memoranda, and answering that it had. 138 F. Supp 3d at 472. The District Court's "express adoption" inquiry drew upon a line of cases originating with the Supreme Court's decision in <u>Sears</u>. <u>Sears</u> involved an FOIA suit by the respondent corporation against the National Labor Relations Board ("NLRB") seeking access to certain intra-agency memoranda. These memoranda, sent by the agency's general counsel to its various regional offices, purported to offer "advice" or "instructions" to the regional offices on whether to allow certain categories of complaints filed by private parties to proceed through the

administrative adjudication process.[5] Id. at 138-42. The agency argued that the "deliberative process" privilege[6] applied to these documents, thus shielding them from disclosure under Exemption 5. Id. at 143. Partly agreeing and partly disagreeing, the Supreme Court held that the memoranda directing the regional offices to turn away certain categories of complaints were not protected by Exemption 5, but that the memoranda directing the regional offices to allow certain complaints to proceed were shielded by Exemption 5. The Court's reasoning was that the memoranda directing the regional offices to reject certain categories of complaints effectively functioned as final adjudications of those complaints. These memoranda, though pre-decisional and deliberative in form, were binding and precedential in substance. Recognizing that the deliberative process privilege cannot apply to a document that in fact represents a final ruling on the law, the Court held that "Exemption 5, properly construed, calls for disclosure of all opinions and interpretations which embody the agency's

---

[5] Under the administrative scheme described in Sears, private parties could file complaints arising under the federal labor laws before the NLRB, but the complaint would only receive an administrative adjudication if the agency's general counsel allowed the complaint to move forward, in which case the general counsel would "become[] an advocate before the Board in support of the complaint." Id. at 138-39.

[6] The opinion refers to this as the "executive privilege," see id. at 149-50, but this Court has previously explained that the "deliberative process privilege . . . is encompassed within the executive privilege." Am. Civil Liberties Union v. Nat'l Sec. Agency, 925 F.3d 576, 592 n.70 (2d Cir. 2019) (quoting Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 481 (2d Cir. 1999)).

effective law and policy." Id. at 153 (internal quotation marks and citations omitted). Construing Exemption 5 to shield such documents would eviscerate FOIA's purpose of avoiding "secret law." See id. at 138.

As this Court recently explained in American Civil Liberties Union, 925 F.3d at 592-98, the Supreme Court's holding in Sears rests on a key insight: even when an intra-agency document purports to offer recommendations or advice, an agency may nonetheless regard it in practice as embodying the agency's "working law" on an issue that binds the public. And even when a document is, in fact, pre-decisional and non-binding at the time of its creation, it may over time come to constitute the agency's "working law" if the agency "expressly adopts" the document's reasoning as the agency's official position, or if the agency "incorporates by reference" the document into a final decision. See id. at 593 ("'[W]orking law' describes a category of post-decisional material, and 'express adoption' and 'incorporation by reference' describe two methods by which pre-decisional material can become post-decisional.").[7] The Supreme

---

[7] Express adoption of a pre-decisional document into working law means that "a document first drafted as legal or policy advice has become an agency's 'effective law and policy.'" Id. at 595. Incorporation by reference of a pre-decisional document means that "an agency's formal opinion or determination of law or policy expressly references and relies on that document and its reasoning as the basis for a decision." Id. at 598.

Court held in <u>Sears</u> that in either of these cases, Exemption 5 no longer applies. 421 U.S. at 161. Using broad language, the Court wrote "that, if an agency chooses expressly to adopt or incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5." <u>Id.</u>

This Court has subsequently applied this language from <u>Sears</u> in a variety of "working law" cases, holding each time that Exemption 5 ceases to apply when an intra-agency document comes to embody "working law" that binds the agency and the public. For example, in <u>National Council of La Raza v. Department of Justice</u>, 411 F.3d 350 (2d Cir. 2005), we ordered the government to disclose a memorandum of the Office of Legal Counsel ("OLC") that concludes that state and local officers could lawfully enforce civil provisions of federal immigration law, finding that the Department of Justice had "incorporated" the OLC's advice as its own official position on the law. <u>Id.</u> at 352. Even though this document would have been protected by the deliberative process privilege and the attorney-client privilege at the time of its creation, Exemption 5 no longer applied. <u>Id.</u> at 359-61. Likewise, in <u>Brennan Center v. U.S. Department of Justice</u>,

19

697 F.3d 184 (2d Cir. 2012), we directed the Department of Justice to disclose another OLC memorandum advising USAID that it could constitutionally enforce a "pledge requirement" against U.S.-based organizations, finding again that the record indicated that USAID had expressly adopted the OLC's advice as its final and binding interpretation of the relevant law. See id. at 202-05.

In both of these cases, the dispositive finding was that the memoranda in question, although originally drafted as pre-decisional, attorney-client advice, had been "recycled and reissued as an agency's 'working law,'" Am. Civil Liberties Union, 925 F.3d at 595 (discussing the concepts of "working law," "express adoption," and "incorporation by reference"). This is because the relevant agencies began treating the advice they had received from OLC as binding, both on the agency and on the public. See id. at 594 (working law "binds agency officials or members of the public," "has operative effect — i.e., binding rather than persuasive power," and "announces what an agency's law is, not what the law might be"). In La Raza, the OLC's opinion that state and local police could lawfully enforce the federal civil immigration laws became binding on the public because the Department of Justice allowed state and local officers to begin enforcing these laws; and in Brennan Center, the OLC's opinion that

20

USAID could constitutionally enforce the pledge requirement against U.S. organizations became binding when USAID began enforcing this requirement. In the terminology of Sears, 421 U.S. at 153, the OLC memoranda in these cases came to embody the respective agencies' "working law" or "effective law and policy" because they were not only *final* decisions on legal issues, but also decisions that were *binding* on the public.[8]

However, some language in Brennan Center was initially interpreted to suggest that the "express adoption" exception to Exemption 5 might apply beyond the "working law" context. See 697 F.3d 184, 199. Specifically, some courts read Brennan Center to suggest that a privileged document could lose Exemption 5 protection if the agency adopted or incorporated it into *any* non-privileged document, even if that document were not "working law." This seems to have been the view of the District Court in this case, and the view of the plaintiffs on appeal. 138 F. Supp. 3d at 472-75. But this Court's recent decision in

---

[8] We note a difference between the approach in American Civil Liberties Union and the approach of the D.C. Circuit in Rockwell International Corp. v. U.S. Department of Justice, 235 F.3d 598 (D.C. Cir. 2001). American Civil Liberties Union held that the distinguishing feature of an agency communication that has lost Exemption 5 protection under the Sears line of cases is that it is binding on the agency and the public. In Rockwell, the D.C. Circuit seems to take the approach that the distinguishing feature is rather that the agency communication is a "final opinion . . . made in the adjudication of cases" under 5 U.S.C. § 552(a)(2)(A). 235 F.3d at 602-03. In the present case, however, it is unnecessary to discuss when and whether these approaches actually differ.

American Civil Liberties Union has now resolved the issue the other way, presenting "working law" and "express adoption" as related, not independent, concepts. See Am. Civil Liberties Union, 925 F.3d at 593 ("'[W]orking law' describes a category of post-decisional material, and 'express adoption' and 'incorporation by reference' describe two methods by which pre-decisional material can become post-decisional."). We hold accordingly that an "express adoption" inquiry is only relevant insofar as the previously-privileged intra-agency document has become binding "working law."

In the instant case, Durham's recommendations to Holder on whether to formally investigate and/or criminally prosecute specific instances of alleged CIA wrongdoing — even if expressly adopted by Holder in his final decision — are not *binding* on the public, and thus cannot constitute the "working law" of the Department of Justice.[9] Prosecutors "retain broad discretion to enforce the Nation's criminal laws," United States v. Armstrong, 517 U.S. 456, 464 (1996) (internal quotation marks omitted), but their determinations whether to investigate or prosecute any particular defendant are not precedential and affect

---

[9] We therefore find it unnecessary to rule definitively on whether the "working law" doctrine trumps the attorney work product privilege for the purposes of Exemption 5, and we reserve the question as we did in Wood v. F.B.I., 432 F.3d 78 (2d Cir. 2005).

no one other than that defendant. These decisions are not even "binding" on the agency itself. Even after Holder announced publicly that he had accepted the recommendations in Mr. Durham's memoranda, he retained jurisdiction to reverse course and bring charges at a later time.

For these reasons, the prosecutorial determinations made by Durham and Holder were not, and could not have been, "working law." While the agency's decision not to bring charges against any CIA personnel superficially resembles the decisions in Sears by the NLRB's counsel to dismiss private complaints brought before the agency, there are at least two critical differences. First, once an NLRB regional office followed the general counsel's instruction to dismiss a complaint, the general counsel could not reverse his earlier determination at will. Second, the memoranda in Sears were precedential by their nature, while prosecutorial decisions are not, because of the inherent discretion prosecutors have to enforce the law. See also Sears, 421 U.S. at 156 n.22.[10]

---

[10] It is true that in Niemeier v. Watergate Special Prosecution Force, 565 F.2d 967 (7th Cir. 1977), on somewhat similar facts, the Seventh Circuit held that the Watergate Special Prosecution Force had "expressly adopted or incorporated" an internal prosecutorial memorandum setting forth reasons not to indict former President Nixon by referencing that memorandum in the Force's final report. Id. at 970-71. A key difference between that case and the instant case, however, is that the Watergate Special Prosecutor was required "upon completion of his assignment [to] submit a final report to . . . Congress." Id. at 971. This publication requirement, not present in the case at hand, transformed the Force's report into a 5 U.S.C. § 552(a)(2)(A) "final opinion" and subjected it to the heightened disclosure requirements of § 552(a)(2). The court characterized its holding as "very narrow," and explained that

Withholding the memoranda that the Times seeks in this case also does not implicate the same concerns about "secret law" that we had in Brennan Center and other cases. This Court and the Supreme Court have long recognized that the policy underlying the working law doctrine is that an agency ought not be permitted to "promulgate[] a body of secret law which it is actually applying in its dealings with the public but which it is attempting to protect behind a label." Brennan Ctr., 697 F.3d at 200 (quoting Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 869 (D.C. Cir. 1980)). Durham's memoranda, however, raise few, if any, concerns about secret law. Because of the inherently discretionary and non-precedential nature of prosecutorial determinations, Durham's recommendations in this case bear little or no relevance to any other potential defendant in any other case. Unlike the documents in La Raza and Brennan Center, therefore, no party other than the particular defendants under investigation would have gained any insight into their own legal rights or obligations by reading Durham's memoranda. These memoranda set forth no

---

"although we hold on the facts of this case that the [Watergate Special Prosecution Force] Report is a final disposition for purposes of the FOIA, we come to this conclusion '(w)ithout deciding whether a public prosecutor makes "law" when he decides not to prosecute or whether memoranda explaining such decisions are "final opinions" . . . .'" Id. at 972 (quoting Sears, 421 U.S. at 156 n.22).

24

rule of law that another party could unwittingly violate, and neither could any party accused of wrongdoing cite them in his or her defense. Our language about "secret law" in other Exemption 5 contexts, therefore, says little about the necessity of disclosure here.

Given our holding that the "working law" doctrine is inapplicable to this situation, the only remaining question is whether the Durham memoranda remain privileged attorney work product, or whether Holder's public statements waived the work product protection. We now proceed to examine the common law work product waiver doctrines and apply them to Holder's two public statements about Durham's investigation.[11]

---

[11] It is worth noting that the Second Circuit has previously used a straightforward waiver-of-privilege analysis to resolve a FOIA Exemption 5 case, rather than wading into the "express adoption or incorporation by reference" waters. In another case also called New York Times v. U.S. Department of Justice, 756 F.3d 100 (2d Cir. 2014), the New York Times sued under FOIA for access to a memo setting out the government's legal reasoning behind its conclusion that targeted killings of United States citizens by drone aircraft were lawful. DOJ claimed that this memo was covered by Exemption 5 because it contained attorney-client privileged legal advice. In an opinion by Judge Newman, the Court analyzed whether public statements by various agency officials disclosing parts of the legal reasoning within the memo were sufficient to waive the attorney-client privilege and concluded that they were. See also Shinnecock Indian Nation v. Kempthorne, 652 F. Supp. 2d 345 (E.D.N.Y. 2009) (employing a waiver analysis to determine whether the agency's disclosure of a document in redacted form constituted a waiver of work product protection of the redacted portions for the purposes of FOIA Exemption 5).

B.  Waiver of Attorney Work Product Privilege

The qualified privilege for attorney work product is designed to shield

"mental impressions, conclusions, opinions or theories concerning the litigation."

Adlman, 134 F.3d at 1195 (2d Cir. 1998). The FOIA context is obviously more

broad than litigation or the contemplation of it.

Like the other civil discovery privileges,[12] however, the protection afforded

by the work product privilege "is not absolute." United States v. Nobles, 422 U.S.

225, 239 (1975). A party waives the work product protection by taking actions

inconsistent with this its purpose, such as disclosing work product to its

adversary, In re Steinhardt Partners, 9 F.3d 230, 235 (2d Cir. 1993), or by placing

privileged documents "at issue" in a litigation, John Doe Co. v. United States, 350

F.3d 299, 302 (2d Cir. 2003) ("A party . . . impliedly waives work product

protection if it places the substance of the documents for which the protection is

claimed at issue."); see also Rockwell Intern. Corp. v. U.S. Dept. of Justice, 235

F.3d 598, 605-06 (D.C. Cir. 2001) (noting that a party waives the work product

privilege by making "testimonial use" of the documents). These doctrines may

---

[12] This Court has, on several previous occasions, discussed the waiver of the attorney-client privilege. See, e.g., Am. Civil Liberties Union v. Nat'l Sec. Agency, 925 F.3d 576, 590-91 (2d Cir. 2019); Brennan Ctr. v. U.S. Dep't of Justice, 697 F.3d 184, 207 (2d Cir. 2012); In re County of Erie, 546 F.3d 222 (2d Cir. 2008); In re Grand Jury Proceedings, 219 F.3d 175 (2d Cir. 2000).

apply in the Exemption 5 context much as they do in ordinary civil discovery.

Just as Exemption 5 transplants the work product privilege into the FOIA

context, 5 U.S.C. § 552(b)(5), so too does it import the judicially-recognized

doctrines governing the waiver of the privilege. See F.T.C. v. Grolier Inc., 462

U.S. 19, 26 (1983) ("By its own terms, Exemption 5 requires reference to whether

discovery would normally be required during litigation with the agency.")

(emphasis omitted).

It is not disputed here that Durham's memoranda were attorney work

product at the time they were drafted, in part because Durham prepared them in

anticipation of possible criminal prosecutions. In their supplemental briefing,

however, plaintiffs-appellees argue that Holder's public statements about these

memoranda waived the privilege, thus subjecting them to disclosure under

FOIA.[13]

---

[13] Defendants-appellants argue that plaintiffs-appellees have forfeited any reliance on a waiver argument by not raising it in their initial brief. We disagree. The issue of waiver is "properly before the court" on the instant facts, and we are "not limited to the particular legal theories advanced by the parties" in their initial briefs. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991).

1.  Waiver Doctrines

    a.  Waiver by Disclosure

Plaintiffs-appellees first invoke the doctrine that a litigant waives the work product protection by voluntarily disclosing privileged material to its adversary. Steinhardt Partners, 9 F.3d 230; see also SEC v. Gupta, 281 F.R.D. 169, 171 (S.D.N.Y 2012) ("Work product protection . . . may be waived if the work product is voluntarily disclosed."); In re Terrorist Attacks on Sept. 11, 2001, No. 03-MDL-1570, 2013 WL 2641383, at *3 (S.D.N.Y. June 12, 2013) (work product protection is waived upon disclosure to an adversary or disclosure to a non-adversary that "materially increases the likelihood that an adversary can gain access to that information"); Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 229 F.R.D. 441, 445 (S.D.N.Y. 2004) ("Generally speaking, the work product privilege should not be deemed waived unless disclosure is inconsistent with maintaining secrecy from possible adversaries.") (internal quotation marks and alterations omitted); In re Sealed Case, 676 F.2d 793, 817 (D.C. Cir. 1982) ("[A] party waives its work product protection in civil litigation if it discloses the privileged material to anyone without common interests in developing legal theories and analyses of documents.") (internal quotation marks omitted).

In the FOIA Exemption 5 context (where adversaries often do not exist), this doctrine provides that public disclosure of specific details from an otherwise privileged agency memorandum waives the work product protection with respect to those facts. The D.C. Circuit, for example, has previously evaluated in an Exemption 5 case whether selective quotation of privileged documents in a non-privileged document waived the work product protection with respect to the privileged document. Rockwell Int'l Corp. v. U.S. Dep't of Justice, 235 F.3d 598, 605 (D.C. Cir. 2001). Here, of course, we must evaluate the impact of verbal statements describing the content of privileged memoranda, rather than actual disclosure of the memoranda themselves. But we see no reason not to apply the same inquiry. We have previously looked to "common sense" to "define the limits of the work product doctrine," Steinhardt Partners, 9 F.3d at 235 (2d Cir. 1993), and common sense suggests that verbal description of the contents of a document, if sufficiently specific, is as "inconsistent with the maintenance of secrecy," Rockwell, 235 F.3d at 605 (quoting United States v. Am. Tel. & Tel. Co., 642 F.2d 1285, 1299 (D.C. Cir. 1980)), of that document as would be disclosure of the document itself.

b. "At-Issue" Waiver

This Court has also held that a party waives the work product protection over a document by placing that document "at issue" or by making "testimonial use" of that document. Specifically, "in certain circumstances a party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." John Doe Co. v. United States, 350 F.3d 299, 302 (2d Cir. 2003). We have said that this kind of unfairness may arise when "a party[] advance[es] a claim to a court or jury (or perhaps another type of decision maker) while relying on its privilege to withhold from a litigation adversary materials that the adversary might need to effectively contest or impeach the claim." Id. at 303; see also United States v. Nobles, 422 U.S. 225, 239-40; In re Grand Jury Proceedings, 219 F.3d 174 (2d Cir. 2000) ("[I]mplied waiver may be found where a privilege holder 'asserts a claim that *in fairness* requires examination of protected communications.'") (quoting United States v. Bilzerian, 926 F.2d 1285, 1292) (1991)).

The archetypal example of a situation where this doctrine applies is that of United States v. Nobles, 422 U.S. 225 (1975). There, the Supreme Court identified

a "testimonial" use of work product by a criminal defendant that would be sufficiently unfair to the prosecution so as to waive the privilege. At the underlying trial, the prosecution had called two eye witnesses who identified the defendant as the perpetrator of a bank robbery. Before trial, an investigator for the defense had interviewed these two witnesses, elicited statements that seemed to undermine their credibility, and memorialized these statements in a written report. When the defense sought to call this investigator to testify at trial, the government demanded that the investigator's written report be produced. Id. at 227-30. The defense objected, citing the work product privilege. Id. at 236-40. But the Supreme Court agreed with the government, holding that the defendant "can no more advance the work product doctrine to sustain a unilateral testimonial use of work product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination." Id. at 239-40; see also John Doe Co., 350 F.3d at 303 (discussing Nobles).

As the plaintiffs-appellees note, we have sometimes "used broad language in describing [this] doctrine, such as generalizing about the incompatibility of using . . . assertions as a 'sword' while using privileges attaching to related

31

matter as a 'shield.'" <u>John Doe Co.</u>, 350 F.3d at 302. We have subsequently

clarified, however, that implied waiver of the work product privilege based on

the "fairness" or "at-issue" doctrine is not nearly so broad. To find implied

waiver, we look for specific instances of unfairness that undermine the

adversarial process, and this is inherently a case-by-case determination. <u>Id.</u>

(citing <u>In re Grand Jury</u>, 219 F.3d at 193).

    2.  Analysis

We first evaluate whether Holder's public statements about the

memoranda were specific enough to have effectuated disclosure of parts of the

memoranda and accompanying exhibits, thereby waiving the work product

privilege with respect to those parts. The defendants argue that there is "no

basis" to believe that the government waived the work product privilege, while

the plaintiffs point to several statements by Holder that they believe waive the

privilege.

Specifically, in his June 30, 2011 statement, Holder explained that "Mr.

Durham examined any possible CIA involvement with the interrogation of 101

detainees who were in United States custody subsequent to the terrorist attacks

of September 11, 2001, <u>a number of whom were determined by Mr. Durham to</u>

32

have never been in CIA custody" (emphasis supplied). Then, in his July 11, 2012 public statement, Holder said again that Durham "determined that a number of the detainees were never in CIA custody." We find these statements to be sufficiently specific that they are tantamount to public disclosure of the parts of the relevant memoranda that relate to this finding. Accordingly, we hold that the government waived the privilege over the sections of the memoranda and exhibits relating to the conclusion that a number of the detainees investigated were not in CIA custody. Because Holder referenced this fact in both of his public statements, our holding applies to all five of the memoranda and associated exhibits.

However, the fact that the government waived the work product privilege with respect to these parts of the documents does not automatically mean that the government waived the privilege with respect to the whole documents. See Shinnecock Indian Nation v. Kempthorne, 652 F. Supp. 2d 345, 363 (E.D.N.Y. 2009) (surveying case law and concluding that "the production of a document in redacted form does not automatically waive the protection as to its whole or to related documents"). Moreover, we have held in the "express adoption" context that a limited citation to and quotation of a privileged report does not waive

Exemption 5 protection over the rest of the document. <u>Tigue v. U.S. Dep't of</u>

<u>Justice</u>, 312 F.3d 70, 81 (2d Cir. 2002).

The Times points to three additional parts of Holder's public statements, arguing that these statements also waived the privilege over the parts of the relevant memoranda relating to these statements: first, Holder's discussion of the legal standard Durham employed in deciding whether to prosecute ("Based on the fully developed factual record concerning the two deaths, the Department has declined prosecution because the admissible evidence would not be sufficient to obtain and sustain a conviction beyond a reasonable doubt."); second, Holder's statement that he directed Durham not to prosecute anyone who acted in good faith ("I made clear at that time that the Department would not prosecute anyone who acted in good faith and within the scope of the legal guidance given by the Office of Legal Counsel regarding the interrogation of detainees."); and third, the statutory authority that guided Mr. Durham's analysis ("In reaching this determination, Mr. Durham considered all potentially applicable substantive criminal statutes as well as the statutes of limitations and jurisdictional provisions that govern prosecutions under those statutes.").

We think that none of these statements divulges the content of the memoranda with enough specificity to constitute waiver of the work product privilege. The first statement is not a statement about the content of the report at all, but rather an acknowledgement that DOJ, after considering the report, concluded that the admissible evidence would not be sufficient to obtain a conviction. Although we infer from the context of this statement that Durham may have concluded as much in the report, we do not read Holder's statement as being functionally equivalent to disclosing parts of the memoranda. The second statement plaintiffs identify is likewise not a statement about the contents of the memoranda, but a statement about what Holder told Durham. The third statement, although it does broadly outline how Durham approached his investigation, is too vague and general to have effected waiver of the work product privilege. A private litigant who described her attorney's work product to her adversary in such broad and nonspecific language could not be said to have effectively disclosed that work product. We therefore hold that none of these additional statements identified by plaintiffs waived the work product privilege over any part of the memoranda.

35

We next consider whether Holder placed the contents of Durham's memoranda "at issue" through his public statements, thus impliedly waiving the privilege. Plaintiffs-appellees argue that Holder did so by citing Durham's investigation as part of a public relations offensive. In Plaintiffs' view, Holder relied on the memoranda to "mute criticisms about the decision not to prosecute," but then "stood on privilege to shield the actual analysis employed by Mr. Durham, leaving the public unable to asses whether the Attorney General's assurances of thoroughness were warranted."[14]

In our view, Holder's references to Durham's reports, although clearly spoken with an intent to explain the Department's decision not to prosecute, do not constitute "testimonial use" of the reports and therefore do not waive the work product privilege over the documents. The D.C. Circuit allowed that "[i]t is conceivable that a case might arise in which testimonial use of work product documents would in effect lead to a general waiver of the privilege" negating the application of Exemption 5, Rockwell, 235 F.3d at 607, but we need not consider that hypothesis here. First, while there is little precedent within this Circuit on

---

[14] Plaintiffs-appellees also raise this argument to support the proposition that Holder "expressly adopted" Durham's reports, but for the reasons explained above, we find this doctrine inapplicable here.

how the "testimonial use" waiver doctrine applies within the Exemption 5

context, two other circuit courts have held that an agency's decision to cite

privileged documents in an effort to explain government action and get public

support does not necessarily waive any privilege over those documents. See

Appleton Papers, Inc. v. E.P.A., 702 F.3d 1018, 1026 (7th Cir. 2012) (rejecting the

plaintiff's argument that "the district court erred by allowing the government to

use the portions of the consultant's opinions that it believes are helpful, while

hiding the analysis and the complete opinions from the public view"); Rockwell,

235 F.3d at 607 (the agency "made no testimonial use of the attachments . . . but

instead deployed them . . . in the ensuing struggle for public opinion"). In any

event, Plaintiffs' argument treats as suspect (or as adversarial) the essential

function of any government to explain its position and secure public

understanding and support.

Moreover, we find independently that the fairness concerns of the type

and magnitude we identified in John Doe Co. are not present here. In John Doe

Co., we wrote that at-issue waiver may occur when a party "advance[s] a claim .

. . while relying on its privilege to withhold from a[n] . . . adversary materials

that the adversary might need to effectively contest or impeach the claim." 350

F.3d at 303. In this situation, we do not believe that Holder's decisions would be incontestable. Although the DOJ referenced Durham's work in an effort to explain the reasoning for its decisions not to prosecute, Holder never presented the final decisions as anything other than an exercise of judgment by him and his agency. In his June 2011 statement, for example, Holder explained that "Mr. Durham has advised me of the results of his investigation," but added that "I have accepted his recommendation" (emphasis supplied). And in July 2012, Holder credited Durham with conducting a thorough investigation, but then explained that "the Department has declined prosecution" (emphasis supplied). No one hearing these statements would think anything other than that Eric Holder was explaining the propriety of his policy decisions. Accordingly, we find that Holder's use of Durham's memoranda was not so unfair as to implicate our concerns in John Doe Co.

## CONCLUSION

For the foregoing reasons, the opinion of the District Court is affirmed in part and reversed in part. The Department of Justice is directed to release the portions of John Durham's memoranda and associated exhibits that relate to the conclusion that some of the detainees were not in CIA custody. The case is

38

remanded to the District Court to effectuate such disclosure, consistent with this

opinion.